**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-2100
_____

UNITED STATES OF AMERICA

v.

FRANKLIN BUTLER,

Appellant.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(No. 02-cr-00300-1)
District Judge: Hon. Bruce W. Kauffman
Argued May 23, 2007

Before: CHAGARES, HARDIMAN, and TASHIMA,* <u>Circuit Judges</u>.

_____

(Filed: December 28, 2010)

Guillermo L. Bosch, Esq. (Argued)
12 Oxford Lane
New Oxford, PA 17350-1614

<u>Counsel for Appellant</u>

_____

*The Honorable A. Wallace Tashima, United States Circuit Judge for the Ninth
Circuit Court of Appeals, sitting by designation.

Jose R. Arteaga (Argued)
Assistant United States Attorney, Eastern District of Pennsylvania
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

Counsel for Appellee

OPINION

CHAGARES, Circuit Judge.

Franklin Butler was tried and convicted of various drug-related offenses arising out of a warrantless police search of an Allentown, Pennsylvania apartment. On appeal, Butler contends that this search, which led to his arrest and to the discovery of significant amounts of inculpatory evidence, violated his Fourth Amendment rights. The dispositive issue is whether the police created the exigent circumstances on which they relied for executing the warrantless search Butler now challenges. We hold that they did not, and will affirm Butler's conviction.

I.

The facts pertinent to this appeal are largely undisputed and may be stated succinctly. After receiving a report that drug trafficking activity was taking place at an apartment building located at 941 Hamilton Street in Allentown, Pennsylvania, undercover Allentown Police Officers Christopher Cruz, Michael Faulkner, and Pete McAfee went to that address. Appendix (App.) 396. Once on location, Officer Cruz

2

spoke with the complainant, who identified Apartment #304 as the likely locus of the drug dealing. App. 401. She also cautioned that one of the occupants was armed and often kept a handgun in his waistband. Cruz then called for backup, and Allentown Police Officers William Reinik, Michael Mancini, and Kyle Hough responded to Cruz's request. App. 403. The officers placed Apartment #304 under surveillance for approximately fifteen minutes, but their efforts proved fruitless, as they did not observe anyone entering or departing the apartment.

The officers next decided to employ the so-called "knock and talk" technique to investigate further. The officers split into two groups. The first group, which consisted of Officers Cruz, Reinik, and Mancini, proceeded to the front door of Apartment #304. The remaining officers covered a separate door which led to a different part of the apartment. App. 405-06. Officers Reinik and Mancini flanked either side of the front door, while Officer Cruz positioned himself directly in front of the front door.

Officer Cruz knocked on the front door. When a voice from inside asked who was there, Officer Cruz responded, "Chris." App. 406-07. A man later identified as Butler opened the door slightly, holding a pistol at hip level in his left hand, aimed at Officer Cruz.[1] Seeing the handgun pointed at him, Officer Cruz yelled, "Go, go, go, gun," and directed Officer Mancini to enter the apartment. App. 254, 409-10. The three officers simultaneously identified themselves as police, and Butler attempted to slam the door.

---

[1]Butler, for his part, maintains that he never pointed any firearm at Officer Cruz. For the reasons stated *infra*, we reject this argument.

App. 253-54.  Officer Reinik stuck his foot in the doorway, preventing Butler from slamming the door.  Id.  Butler fled into the apartment, and Officer Cruz instructed Officer Mancini and the other officers to enter the apartment.  The officers pursued Butler into a bedroom, where they found him lying under a blanket on a makeshift mattress on the floor.  App. 412.  Butler's co-defendant, Bill Murray, was also in the bedroom.  Police found Murray using a razor to cut a large white rock that was later determined to be crack cocaine.  App. 412, 421, 617.  Five crack pipes were present on the table next to Murray.  App. 639.  Police secured both men and searched the room for weapons.  When Butler failed to respond to the officers' inquiries about where the gun he had pointed at Cruz was located, Officer Hough picked up the blanket that had been covering Butler, and a loaded nine-millimeter pistol fell to the floor.  App. 413-15.

A search of Butler led to the discovery of $672 in cash, and thirty-seven ziploc bags, each containing crack cocaine.  Murray and Butler both waived their Miranda rights, and Murray (the lessee) consented to a search of the apartment, which turned up further drug-related paraphernalia, including Inositol, commonly used as a cutting agent for cocaine, and numerous unused plastic baggies.  App. 416-22.  Butler also told the police that he possessed the gun to protect his product, and that he made approximately $5,000 in a good week selling drugs from Apartment #304.  App. 420.

Thereafter, Butler was charged with conspiracy to distribute crack cocaine and possession of crack cocaine with intent to distribute, in violation of 21 U.S.C. § 846 and §

4

841, and with carrying a firearm in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Butler moved to suppress the evidence the government obtained from the search at issue. The District Court denied Butler's motion, and a jury later convicted him on all three counts. Butler now appeals.[2] We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

### A.

At the outset, we must address the government's contention that Butler lacks standing to challenge the search of Apartment #304. The government argues that because Butler was merely a temporary guest at Apartment #304, he lacks standing to contest the legality of the government's search.

The short answer to this is that the government has waived its right to challenge Butler's standing. By its own admission, the government failed to raise this argument to the District Court, and we therefore will not consider it here. Unlike Article III standing, which cannot be waived, Fourth Amendment standing can be waived if not raised and properly preserved. See Rakas v. Illinois, 439 U.S. 128, 140 (1978) ("[T]his Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment

---

[2]Butler's co-defendant at trial, Murray, is not a party to this appeal.

5

law than within that of standing."); see also United States v. Washington, 380 F.3d 236, 240 n.3 (6th Cir. 2004) ("'Standing to challenge a search or seizure is a matter of substantive Fourth Amendment law rather than of Article III jurisdiction, meaning that the government can waive the standing defense by not asserting it.'" (quoting United States v. Huggins, 299 F.3d 1039, 1050 n.15 (9th Cir. 2002))); United States v. Dewitt, 946 F.2d 1497, 1499-1500 (10th Cir. 1991) ("[T]he issue of [F]ourth [A]mendment standing could be waived if the government has failed to raise it in a timely fashion during the litigation." (quotation marks and alterations omitted)). Accordingly, our analysis properly proceeds to the merits of Butler's challenge.

B.

We begin our analysis with the pertinent constitutional text. The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

This provision limits government action in two related ways. First, it requires that the government conduct only reasonable searches and seizures. Second, it sets out (albeit at a high level of generality) the prerequisites that government officials must complete before executing a search or seizure, which include obtaining a warrant. "The Supreme

Court has read the Amendment's twin commands in tandem, holding that when people have a reasonable expectation of privacy in their persons or effects, all searches and seizures must be supported by a warrant, unless they fall into one of the exceptions to that requirement." United States v. Hartwell, 436 F.3d 174, 177 (3d Cir. 2006) (citing Minnesota v. Dickerson, 508 U.S. 366, 372 (1993) ("Time and again, this Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well delineated exceptions.") (quotation marks and citations omitted)).

One such exception to the warrant requirement is when exigent circumstances exist. See Steagald v. United States, 451 U.S. 204, 211-12 (1981); Couden v. Duffy, 446 F.3d 483, 496 (3d Cir. 2006) (observing that exigent circumstances is an "established exception[]" to the warrant requirement). Examples of exigent circumstances include, but are not limited to, the imminent loss or destruction of evidence, hot pursuit of a fleeing felon, and the risk of danger to police officers or others. See United States v. Coles, 437 F.3d 361, 366 (3d Cir. 2006); Estate of Smith v. Marasco, 318 F.3d 497, 518 (3d Cir. 2001) ("It is established that there are exigent circumstances if the safety of either law enforcement or the general public is threatened . . . . Inasmuch as the officers had reason to believe that a laser-sighted weapon was being pointed at them, they had reason to fear for their own safety. Consequently, there were exigent circumstances . . . ."); Couden,

446 F.3d at 496 (police officers reasonably believed a person was in imminent danger). Warrantless searches are permitted in such "limited situations," we have held, because "the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion." Coles, 437 F.3d at 366.

At the same time, however, police cannot avail themselves of the exigent circumstances exception to the warrant requirement if *they* deliberately create the exigent circumstances. See id. ("Exigent circumstances, however, do not meet Fourth Amendment standards if the government deliberately creates them."); United States v. Acosta, 965 F.2d 1248, 1254 (3d Cir. 1992) (same). In assessing whether the police impermissibly create exigent circumstances, we focus on "the reasonableness and propriety of the officers' actions and investigative tactics leading up to the warrantless entry." Coles, 437 F.3d at 370.

Not every interaction police initiate with citizens implicates the Fourth Amendment. For instance, the Fourth Amendment does not proscribe police from seeking citizens' voluntary assistance in discovering or investigating crime. See Florida v. Bostick, 501 U.S. 429, 439 (1991) ("The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation."); see also Marasco, 318 F.3d at 519 ("Officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen

8

may."). Nor must police necessarily identify themselves as police when they investigate criminal activity. If they did, virtually all undercover work would run afoul of the Fourth Amendment. See Lewis v. United States, 385 U.S. 206, 210 (1966) ("[P]etitioner invited the undercover agent to his home for the specific purpose of executing a felonious sale of narcotics . . . . Were we to hold the deceptions of the agent in this case constitutionally prohibited, we would come near to a rule that the use of undercover agents in any manner is virtually unconstitutional per se. Such a rule would . . . severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest."); see also id. at 209 (stating that "the Government is entitled to use decoys and to conceal the identity of its agents" to ferret out criminal activity) (citing Grimm v. United States, 156 U.S. 604 (1895), and Andrews v. United States, 162 U.S. 420 (1896)).

It is therefore clear that officers may seek citizens' consent in investigating crimes, and that officers need not always announce their true identities when they do so. Taken together, these two principles yield a third principle; namely, that, consistent with the Fourth Amendment, police may employ the so-called "knock and talk" technique as a tool to investigate criminal activity. "Knock and talk," as it is commonly referred to, is the investigatory technique by which law enforcement officials approach a dwelling -- typically, that of a person suspected of some criminal activity -- and try to obtain either an occupant's consent to enter (thereby coming within the consent exception to the warrant

9

requirement) or at least to obtain information from an occupant that might enable police to make the requisite evidentiary showing needed to secure a warrant.

"Knock and talk" investigations normally do not raise Fourth Amendment concerns, we have held, because "'when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (*e.g.*, walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.'" Marasco, 318 F.3d at 519 (quoting Wayne R. LaFave, 1 Search and Seizure: A Treatise on the Fourth Amendment § 2.3(f) (3d ed. & Supp. 2003); see also United States v. Chambers, 395 F.3d 563, 568 n.2 (6th Cir. 2005) ("Courts generally have upheld [the 'knock and talk'] investigative procedure as a legitimate effort to obtain a suspect's consent to search."); United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."); United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000) (concluding that, under materially identical circumstances, "no suspicion needed to be shown in order to justify the 'knock and talk'"). The flip side of this is that citizens are free not to cooperate with a "knock and talk" investigation, and, absent a warrant, police cannot detain them, demand entry into their homes, or otherwise compel their cooperation unless an exception to the warrant requirement applies. See

United States v. Thomas, 430 F.3d 274, 277-78 (6th Cir. 2005) (distinguishing between "permissible consensual encounter[s]" and encounters involving "coercive police conduct [such that] the Defendant reasonably believed he had no choice but to comply") (quotation marks and alterations omitted).

C.

It is undisputed that the police did not obtain a search warrant before entering Apartment #304. The government nonetheless argues that exigent circumstances justified police officers' warrantless entry into the apartment. More precisely, the government maintains that when Butler opened the door and pointed a gun at Officer Cruz, he gave Cruz a reasonable belief that his life and the lives of his fellow officers were in danger. Cf. Marasco, 318 F.3d at 518 (finding exigent circumstances existed where police reasonably believed that defendant pointed a weapon at them). The government further argues that once Butler pointed a gun at Officer Cruz, the police had probable cause to believe that Butler had committed various criminal offenses under state law, including felony aggravated assault of a law enforcement official,[3] and could therefore pursue

---

[3]It is immaterial that Butler did not know that Cruz was a police officer when he pointed the gun at him. The Pennsylvania Supreme Court has made clear that

> [§ 2702's] requirement that the officer be "in the performance of duty" in no way implies that liability depends on whether the defendant is aware of his victim's official status. The duties of a police officer, like the officers in the instant case, frequently include undercover investigation in which the officer's official status is intentionally concealed. We do not interpret the language "in performance of duty" to require a defendant to have knowledge of the officer's official status since such a reading would all but

Butler once he fled into the apartment to effectuate his arrest for those crimes notwithstanding the officers' lack of a warrant.  See 18 Pa. C.S.A. § 2702(a)(6) (defining aggravated assault of various public officials, including police officers).  The District Court agreed, finding that the warrantless entry in issue here fell within the exigent circumstances exception to the warrant requirement, and therefore denied Butler's motion to suppress the evidence authorities obtained in their search of Apartment #304.

"The presence of exigent circumstances is a finding of fact, which we review for clear error."  Coles, 437 F.3d at 366.  The question, then, is whether the District Court committed clear error in determining that exigent circumstances justified the warrantless entry in issue here.

Butler, for his part, makes two arguments in an effort to show that the District Court erred in denying his motion to suppress.  First, Butler claims that he did not point a gun at Officer Cruz when he answered the door, and that Cruz's testimony to the contrary is mistaken.  In support of this claim, Butler cites the testimony of Officer Reinik, who testified that he did not see Butler holding a gun.  According to Butler, Officer Reinik was in the best position to see whether Butler was holding a gun given his position to the side of the door opposite Butler.  See Butler Br. at 31 ("P.O. Cruz was in a poor position to physically see the person who opened the door to Apartment No. 304 and, thus, to see

_____

strip the undercover officer of the protection the legislature intended to afford him.

Commonwealth v. Flemings, 652 A.2d 1282, 1285 (Pa. 1995).

12

whether or not that person was carrying a weapon. Certainly, P.O. Cruz was in a much worse position than P.O. Reinik to see the person who opened the door. P.O. Reinik did not see a gun."). Because Officer Reinik did not see Butler holding a weapon, Butler argues that the District Court erred in crediting this aspect of Officer Cruz's testimony.

Closer examination of Officer Reinik's testimony reveals that this purported contradiction is more illusory than real. Officer Reinik testified only that he "didn't see [Butler's] hands at all," App. 592, which is quite different from saying that he saw Butler's hands and that Butler was not holding a weapon. Because Officer Reinik did not see Butler's hands, he obviously could not speak to whether or not Butler was holding a weapon when he answered the door.

Even assuming *arguendo* that a conflict existed between the testimony of Officer Reinik and that of Officer Cruz regarding the presence or absence of a gun, we are compelled to reject Butler's argument given the deferential clear error standard that we must apply to the District Court's factual findings. Reconciling conflicting eyewitness testimony is grist for the factfinder's mill, and we cannot overturn that sort of credibility determination except in the rarest of circumstances. Here, Butler asks us to overrule the District Court and to credit the testimony of one eyewitness to an event -- Officer Reinik -- over that of another eyewitness to the same event -- Officer Cruz -- whom the District Court credited. Yet Butler does not explain why this is the exceptional case in which we should not defer to the factfinder. Accordingly, even if we were to perceive a conflict

13

between the testimony of Officers Cruz and Reinik (which we do not), we would not substitute our judgment for that of the District Court.

Butler's second argument is that the police cannot avail themselves of the exigent circumstances exception to justify the warrantless search at issue here because the police themselves manufactured the exigent circumstances on which they based their entry. In this respect, Butler relies almost exclusively on our decision in United States v. Coles, in which we invalidated a warrantless search on the ground that police had impermissibly created the exigency.

The pertinent facts of Coles are as follows. Terrence Coles was staying in a hotel room in Philadelphia for an extended period of time. The hotel manager, David Bradley, had unsuccessfully sought to locate Coles to discuss payment for the room, and Bradley let himself into Coles's room to see if the room was still occupied. Upon doing so, Bradley observed what he believed to be drugs and drug-related paraphernalia in the room, and immediately contacted the police. The police entered Coles's room without a warrant, an entry the government later conceded was illegal. Thereafter, the police decided to put Coles's room under covert surveillance. Apparently frustrated at the progress of their stakeout, authorities decided to try to access Coles's room. Police first attempted to gain access by subterfuge, knocking on the door and announcing "room service." A voice from inside responded that they had not ordered anything, and refused to open the door. Police again knocked, this time stating that they were from maintenance

14

and were responding to a leak. The occupants refused entry a second time, responding that there was no leak. Police abandoned subterfuge on their third attempt. Knocking forcefully on the door, the officers identified themselves as police, telling the occupants to "'open the door, this is the police.'"[4] Id. at 363. The majority described what occurred next:

> At this critical juncture, the officers heard the sounds of rustling and running footsteps. Sgt. Josey attempted to open the door using an electronic passkey provided by [the hotel manager], but the officers could not enter because there was a bar latch over the door. After partially opening the door with the passkey, the officers heard the sound of a toilet flushing and the sounds of more running.
>
> Coles eventually opened the door for the officers. Upon entering the room, the police discovered, among other things, several containers of cocaine base "crack," multiple bags containing cocaine, 25 vials of "crack" cocaine, approximately $2,000 in cash, and a firearm inside of Coles's open carrying bag . . . . Coles [was] then arrested.

Coles, 437 F.3d at 364 (footnotes omitted).

A divided panel ruled that the police search violated the Fourth Amendment because the police created the exigent circumstances on which they relied for the warrantless search. The majority held:

> We emphasize that the record reveals no urgency or need for the officers to take immediate action, prior to the officers' decision to knock on Coles's hotel room door and demand entry. It is, of course, true that once the officers knocked on the door and announced, "open the door, this is the police," they heard sounds indicating that evidence was being destroyed. But that exigency did not arise naturally or from reasonable police

_____

[4]It is unclear what amount of time elapsed between the police's three attempts to gain entry in Coles.

15

investigative tactics. Quite to the contrary, the officers, after their pretextual announcements had failed to gain entry to room 511, deliberately created the exigency by knocking on the door to room 511 and demanding entry.

Id. at 371.

This case is clearly distinguishable from Coles. For one, Officer Cruz and his fellow officers were far less certain that criminal activity was occurring in the dwelling. It is true that an informant had alleged that drug trafficking was occurring, but the informant's reliability was unknown and the officers had been unable to corroborate the tip, as they did in Coles, by entering the dwelling and viewing the evidence for themselves. As a part of this investigation, Officer Cruz knocked on the door of Apartment #304 and identified himself as "Chris," while his fellow officers provided backup, a perfectly reasonable precaution in light of the informant's warning that at least one occupant of Apartment #304 was armed.[5] Butler was free to speak with "Chris" or to ignore him; had he chosen the latter, Officer Cruz could not have lawfully demanded entry given the officers' lack of a warrant. It is undisputed that Butler opened the door voluntarily. Critically, when he did so, he pointed a gun at Officer Cruz. At that point, and only at that point, exigent circumstances arose, *created by Butler*, as Officer Cruz had

_____

[5]Butler makes much of the fact that in supporting Officer Cruz, the other officers arrayed themselves "in combat formation." The only way that this could conceivably be relevant is if (i) Butler was aware of these officers' presence and (ii) as a result, Butler reasonably believed that he had no option but to open the door and cooperate with Cruz. Because there is no evidence that Butler was even aware of these officers' presence (let alone that they were police officers), the officers' choice of tactical formation is beside the point.

16

reason to believe that his life and the lives of his fellow officers were in danger. Officer Cruz relatedly had probable cause to believe that Butler had committed aggravated assault by pointing a pistol at him, and could therefore lawfully pursue a fleeing Butler into the apartment to arrest him. For these reasons, exigent circumstances justified the officers' entry into Apartment #304 to secure Butler's arrest.

Butler disagrees, maintaining at oral argument that because the police had probable cause to obtain a search warrant, they impermissibly engaged in a "knock and talk" investigation.[6] In this respect, Butler relies on our statement in Coles that the police "had no legitimate reason to utilize the 'knock and talk' procedure" in view of the fact that the officers already had (in the majority's view) probable cause to obtain a search warrant. Id. at 370. Because the officers had probable cause to suspect criminal activity was going on in Apartment #304, Butler argues, the warrantless search at issue here was equally invalid, and the officers' failure to obtain a search warrant militates in favor of a finding that the police created the exigent circumstances in issue. Therefore, Butler asserts, the evidence they discovered is properly designated fruit of the proverbial poisonous tree.

We are unpersuaded. While it is true that the officers in this case, as in Coles, may have had probable cause to secure a warrant based on informants' observations, we

_____

[6]We note that in taking this position, Butler directly contradicts the argument he advanced in his brief, in which he stated that "[i]t is Appellant Butler's argument that the Allentown police officers did not have the requisite probable cause . . . to validate their warrantless entry into, and search, of the premises of Apartment No. 304." Butler Br. at 16-17.

cannot see why the existence of probable cause, in and of itself, should make any constitutional difference to the warrantless search either in that case or in this one. The Supreme Court has made clear that "[l]aw enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." Hoffa v. United States, 385 U.S. 293, 310 (1966). Under a contrary rule, police would be required, in effect, to make the very evidentiary determinations that the Fourth Amendment expressly reserves to magistrates. See Johnson v. United States, 333 U.S. 10, 13-14 (1948). What is more, such a rule likely would have a profound chilling effect on police investigative tactics. If excessive evidence of criminal activity could invalidate an otherwise permissible warrantless search, police would understandably be reluctant to employ even those investigative tactics such as "knock and talk" which normally do not raise Fourth Amendment concerns. This is so because if police knew that if their "knock and talk" went as planned and they obtained the requisite consent to enter the apartment or other information bolstering their ability to demonstrate probable cause, the fruits of their investigation nonetheless would be susceptible to judicial suppression on the ground that police had probable cause at the time they initiated the "knock and talk."

That cannot be right. The Fourth Amendment, as courts have interpreted and applied it, sets a minimum evidentiary hurdle that law enforcement must clear before they

18

can obtain a warrant that permits them to enter a person's home lawfully; it does not also set an evidentiary ceiling that, if transgressed, could invalidate a subsequent warrantless search even where that search falls within an exception to the warrant requirement.

Scrutiny for an overabundance of evidence of criminal activity could moreover have the anomalous effect of immunizing some criminal activity in the name of the Fourth Amendment even when a person's Fourth Amendment rights have not been implicated. For instance, assume that Coles, in response to the officers' announcements of "room service" and "maintenance," correctly deduced that the men outside his door were police officers, and opened fire through the door. At the point Coles fired, police had neither announced themselves nor tried to enter the apartment; thus, at that point, there would have been no Fourth Amendment violation. It cannot seriously be contended that, once Coles fired at the officers in our hypothetical, thereby providing probable cause, the Fourth Amendment would have prevented police from entering the apartment without a warrant to apprehend Coles in that case, notwithstanding whatever quantum of inculpatory evidence the officers might have possessed before attempting their ill-fated "knock and talk." Cf. Ewolski v. City of Brunswick, 287 F.3d 492, 505 (6th Cir. 2002) ("When an officer observes facts giving rise to exigent circumstances in the course of such a consensual encounter, it usually cannot be said that the officer impermissibly 'created' the exigent circumstances. Although [the officers'] strategic decision not to identify themselves immediately may have been ill-advised, and may even have

19

contributed to [the suspect's] agitation, this conduct did not give rise to a claim that the police impermissibly created the exigency.").

In the end, Butler's proffered interpretation of <u>Coles</u> would require law enforcement to seek a search warrant as soon as officers believed they could make the requisite probable cause showing for fear of obtaining too much inculpatory evidence that could later come back to invalidate an otherwise permissible investigation. At the same time, however, if officers sought a search warrant too soon, a magistrate would be constitutionally bound to turn them away. The Fourth Amendment does not compel law enforcement to perform this sort of "not too soon, not too late, but just right" Goldilocks-style analysis to determine when they should seek a warrant, and we refuse to endorse an analysis that would effectively place officers on the horns of this dilemma.

We are similarly unpersuaded by Butler's suggestion that Officer Cruz's use of subterfuge in conducting the "knock and talk" demonstrates the unreasonableness of the investigation. Officer Cruz testified that he felt identifying himself as law enforcement would deter the occupants from opening the door and conversing. App. 281. Thus, Officer Cruz's subterfuge was simply a prudent and reasonable adaptation of the "knock and talk" technique to the circumstances, and not, as in <u>Coles</u>, a thinly-veiled attempt to precipitate the crisis necessary to justify a warrantless intrusion. It is well-established that police do not necessarily have to identify themselves as police when they investigate criminal activity. See <u>Lewis</u>, 385 U.S. at 210 (stating that "the Government is entitled to

20

use decoys and to conceal the identity of its agents" to ferret out criminal activity).  The mere use of subterfuge, without additional evidence of pretext, does not invalidate a "knock and talk" investigation.

Finally, we cannot agree with Butler that Officer Cruz's investigation was unreasonable in light of the officers' belief that at least one of the occupants of Apartment #304 was armed.  As we have repeatedly noted, firearms are very common tools of the drug trade, see, e.g., United States v. Russell, 134 F.3d 171, 183 (3d Cir. 1998); United States v. Price, 13 F.3d 711, 718-19 (3d Cir. 1994), and police officers will almost always have *some* reason to suspect that the targets of their drug investigations are armed.  Accordingly, accepting Butler's argument would effectively doom "knock and talk" as an acceptable technique in drug investigations.  This, we refuse to do.

For all of these reasons, we reject Butler's contention that the government created the exigent circumstances in issue here.

D.

Butler's final argument is a challenge to the sufficiency of the evidence supporting his conviction.  Butler has a daunting burden to carry, as we must view the evidence "in the light most favorable to the Government, and credit all reasonable inferences that support the verdict[ ]."  United States v. Perez, 280 F.3d 318, 342 (3d Cir. 2002) (citing Glasser v. United States, 315 U.S. 60, 80 (1942)).  Accordingly, we cannot disturb the jury's verdict if "any rational trier of fact could have found the essential elements of the

21

crime beyond a reasonable doubt" based on the evidence introduced at trial. Perez, 280 F.3d at 342 (quotation marks omitted).

At the outset, we note that we have already rejected an identical challenge by Butler's co-defendant, Bill Murray, in a separate appeal. United States v. Murray, 193 F. App'x 145 (3d Cir. 2006) (challenging sufficiency of the evidence supporting his conviction for conspiracy).[7] As the facts set forth previously make clear, law enforcement discovered copious amounts of drugs and drug-related paraphernalia in the course of their search, catching Butler's co-defendant red-handed. Given this, and given the incriminating post-arrest statements made by each defendant, it was a short analytical leap for the jury to conclude as it did: that Butler and Murray were engaged in illicit narcotics trafficking. In view of this overwhelming evidence of Butler's guilt, we have no difficulty determining that the evidence in this case far exceeded the minimum quantum required to sustain the jury's verdict against him.

III.

For the foregoing reasons, we will affirm the decision of the District Court in all respects.

---

[7]Because neither party has raised the issue, we do not decide whether Butler's sufficiency of the evidence challenge is foreclosed by the law of the case. See United States v. Sheeran, 699 F.2d 112, 115 (3d Cir. 1979); see also United States v. Schaff, 948 F.2d 501, 506 (9th Cir. 1991).