**Michelle M. HETZEL, Appellant**

v.

**Marirosa LAMAS; The District Attorney of the County of Northampton; The Attorney General of the State of Pennsylvania.**

**No. 09–3043.**

United States Court of Appeals, Third Circuit.

Argued Jan. 15, 2010.

Opinion Filed: March 24, 2010.

Mark S. Greenberg, (Argued), Lacheen Wittels & Greenberg LLP, Philadelphia, PA, for Appellant.

John M. Morganelli, (Argued), Office of the District Attorney of Northampton County, Easton, PA, for Appellees.

BEFORE: AMBRO, CHAGARES and STAPLETON, Circuit Judges.

*OPINION OF THE COURT*

STAPLETON, Circuit Judge:

Appellant Michelle Hetzel appeals the order of the District Court denying her petition for a writ of habeas corpus. Because we write only for the benefit of the parties, we assume familiarity with the facts of this case and its procedural history. We will affirm.

## I.

On June 15, 2000, the body of nineteen-year-old Devon Guzman was found in her car in Northampton County, Pennsylvania. She died as a result of a four-inch cut in her throat. Immediately after Guzman's body was found, the local newspapers, *The Express–Times* and *The Morning Call,* began publishing articles about her death. On July 29, 2000, *The Express–Times* reported that Brandon Bloss, Hetzel's husband at the time, was a suspect in Guzman's murder. After Hetzel and Bloss were charged in August of 2000 with first degree murder in connection with Guzman's death, the articles began to focus on the criminal investigation, the legal proceedings, and the connections among Hetzel, Bloss, and Guzman. The newspapers reported that Guzman was involved in two lesbian relationships: one with Keary Renner, with whom she lived, and another with Hetzel. Thus they began referring to the case as involving a "lesbian love triangle." The record reflects that between the day Guzman's body was discovered on June 15, 2000, and the day Hetzel and Bloss's jury was chosen on September 24, 2001, the newspapers published approximately seventy-two articles about the case.

Hetzel and Bloss were charged with first degree murder and conspiracy to commit murder in the Court of Common Pleas of Northampton County, Pennsylvania. Before the trial and during voir dire, Hetzel moved for a change of venue, arguing that a fair and impartial jury could not be selected in Northampton County. The trial court denied those motions. Jury selection for the trial began on September 11, 2001, but the Court declared a mistrial after the terrorist attacks of that day. Shortly thereafter, a second trial commenced. Hetzel and Bloss were tried jointly, and the jury convicted them on the first degree murder charge and acquitted them of the conspiracy to commit murder charge. They were both sentenced to life imprisonment.

Hetzel appealed her conviction and sentence to the Pennsylvania Superior Court, including among her arguments the claim that the Court of Common Pleas erred by denying her motions for a change of venue. The Superior Court addressed the change of venue claim on the merits and affirmed. The Pennsylvania Supreme Court declined to hear an appeal of the Superior Court decision. After the Pennsylvania Superior Court denied Hetzel's petition for relief under the Post Conviction Relief Act and the Pennsylvania Supreme Court denied her petition for an appeal of that decision, Hetzel filed a timely petition for a writ of habeas corpus in the United States District Court for Eastern District of Pennsylvania.

The petition included four claims for relief, including Hetzel's claim that the state trial court's denials of her motions for a change of venue violated her due process rights under the Fifth and Fourteenth Amendments. The Magistrate Judge filed a Report and Recommendation, recommending that the petition be denied without an evidentiary hearing and that the District Court decline to issue a certificate of appealability on any of her claims. The District Court adopted the Report and Recommendation in part and denied the petition without an evidentiary

hearing but issued a certificate of appealability on the change of venue claim. Hetzel filed a timely appeal.

## II.

The issue presented in this appeal was adjudicated on the merits by the Superior Court of Pennsylvania. Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2241, *et seq.*, we must affirm the denial of the writ of habeas corpus unless the state adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Vazquez v. Wilson,* 550 F.3d 270, 276 (3d Cir.2008). Because Hetzel does not argue that the standard used by the Superior Court was "contrary to" clearly established federal law, we focus only on whether the decision "involved an unreasonable application of[ ] clearly established Federal law." 28 U.S.C. § 2254(d)(1). The Supreme Court has recognized that "unreasonable" is "difficult to define," but has held that an "unreasonable application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Williams v. Taylor,* 529 U.S. 362, 410–12, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (emphases in original). Instead, we look to whether the "state court's application of clearly established law is objectively unreasonable." *Bell v. Cone,* 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). In making this determination, we presume that the state court's factual findings are correct. 28 U.S.C. § 2254(e)(1). An applicant may rebut that presumption by clear and convincing evidence. *Id.*

In determining whether § 2254(d) prohibits granting the writ, the Court first must determine the applicable "clearly established Federal law, as determined by the Supreme Court of the United States." *See Lockyer v. Andrade,* 538 U.S. 63, 71, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (quoting § 2254(d)(1)). "Clearly established Federal law" is the "governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* We then determine whether the state court's application of this clearly established law to the facts of this case was unreasonable.

## III.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). "[J]urors need not, however, be totally ignorant of the facts and issues involved." *Murphy v. Florida,* 421 U.S. 794, 799–800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). In cases involving intense pretrial publicity, the Supreme Court has held that a change of venue is constitutionally required in certain cases because "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *see Irvin,* 366 U.S. at 722–23, 81 S.Ct. 1639. Yet, we will presume prejudice only in the rare case where the "media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process." *Rock v. Zimmerman,* 959 F.2d 1237, 1252 (3d Cir.1992) (en banc), *abrogated on other grounds by Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *see also Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Supreme Court prec-

edent instructs that, when evaluating whether the pretrial publicity violated the defendant's right to an impartial jury, we are to consider the content, quantity, and timing of the publicity. *See Murphy,* 421 U.S. at 798–803, 95 S.Ct. 2031; *Rideau v. Louisiana,* 373 U.S. 723, 724–26, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Irvin,* 366 U.S. at 724–28, 81 S.Ct. 1639. We may also look to the record of voir dire to examine the effect of the publicity on the venire. *See, e.g., Patton,* 467 U.S. at 1033–35, 104 S.Ct. 2885; *Irvin,* 366 U.S. at 726–27, 81 S.Ct. 1639; *Flamer v. Delaware,* 68 F.3d 736, 754–55 (3d Cir.1995).

In denying Hetzel's change of venue claim, the Pennsylvania Superior Court applied the following standard:

Pre-trial publicity will be presumed to have been prejudicial if the defendant is able to prove that the publicity was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; that such publicity revealed the defendant's prior criminal record, if any, or referred to confessions, admissions, or reenactments of the crime by the defendant; or that it was derived from official police and prosecutorial reports. Even if the defendant proves the existence of one or more of these circumstances, a change of venue or venire is not warranted unless he or she also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated.

*Commonwealth v. Hetzel,* 822 A.2d 747, 764 (Pa.Super.Ct.2003) (quoting *Commonwealth v. Karenbauer,* 552 Pa. 420, 715 A.2d 1086, 1092 (1998)). This standard is consistent with clearly established federal law, and Hetzel does not argue otherwise.

Next, we must determine "whether the state court's application of clearly established law [was] objectively unreasonable." *Bell,* 535 U.S. at 694, 122 S.Ct. 1843. We ask whether "the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under" relevant Supreme Court precedent. *Werts v. Vaughn,* 228 F.3d 178, 204 (3d Cir.2000).

After setting forth the standard for a motion for a change of venue under Pennsylvania law, the Superior Court evaluated Hetzel's claim as follows:

As a result of counsel's request for a change of venue, the trial judge reviewed the media accounts of the case and considered Hetzel's claim of prejudice. The court denied the motion because it concluded that the published reports, though voluminous, were not "sensational, inflammatory nor slanted toward conviction, but [were] factual and objectively reported." Nonetheless, the court indicated that it would revisit the issue if it became "evident during jury voir dire that the ability . . . to empanel a fair and impartial jury has been compromised by the pretrial publicity."

Thereafter, jury selection in the case was thorough and careful. The court dismissed for cause all jurors who hinted at having a fixed opinion in the case or who believed they were unable to be fair or impartial. While the majority of the jurors chosen to serve had some knowledge of the case through the media, none reported that the exposure prompted a fixed opinion and all stated that they would decide the matter consistent with the court's instructions and based on the evidence presented at trial.

In light of the conscientious and methodical manner in which the court presided over jury selection in this case, as well as our limited scope of review, we

cannot find that there was an abuse of discretion in refusing to grant the change of venue. The record simply does not reveal an extensive, sustained, or pervasive effect from the media coverage in this case.

*Hetzel*, 822 A.2d at 764–65 (citations omitted).

We find no error in this analysis. A review of the newspaper articles in the record establish that they are, as the trial court found, largely "factual and objectively reported." *Id.* at 764 (quoting the trial court's opinion). The articles focus on Guzman's death, the police investigation, the arrest of Hetzel and Bloss, and the court proceedings before the trial. Many of the articles do refer to the "lesbian love triangle," but these articles do not report that Hetzel confessed to the crime or call for Hetzel's conviction. Nor was there any coverage of any past criminal acts or misdeeds by Hetzel, other than her adulterous affair. Although Hetzel claims that the newspapers published letters to the editor calling for her conviction and the death penalty, only two of the letters to the editor in the record—penned by the same woman—call for conviction and the death penalty. Additionally, in one of the letters, the writer identifies Guzman as her niece. Therefore, Hetzel has not rebutted the presumption that the trial court correctly found that the articles were primarily factual in nature and "no[t] slanted toward conviction." *Id.* (refusing to disturb the trial court's findings).

Although Hetzel compares her case to *Rideau*, the content of the newspaper coverage here is distinct from the publicity there. *Rideau* involved the dissemination of a film showing Rideau confessing to the crime with which he was charged. 373 U.S. at 724–27, 83 S.Ct. 1417. Obviously, watching the defendant confess to a crime is likely to have the effect of persuading community members that the defendant is, in fact, guilty of committing the crime. Here, the articles were much less likely to have the effect of convincing potential jurors of Hetzel's guilt than the film of a confession at issue in *Rideau*. The content of the coverage is also distinguishable from that in *Irvin*, in which the press repeatedly reported that Irvin had confessed to the crime, reported on his prior criminal convictions, and claimed he had offered to plead guilty to the crime he was charged with committing. 366 U.S. at 725–726, 81 S.Ct. 1639.

Additionally, there was a significant passage of time between the height of the media coverage in the summer of 2000 and the trial in September 2001. "That time soothes and erases is a perfectly natural phenomenon, familiar to all." *Patton*, 467 U.S. at 1034, 104 S.Ct. 2885; *see Murphy*, 421 U.S. at 802, 95 S.Ct. 2031. In *Patton*, the Supreme Court explained that, although potential jurors may remember the crime, "[i]t is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have passed." 467 U.S. at 1035, 104 S.Ct. 2885. Here, the intensity of the coverage diminished between the discovery of Guzman's body and the trial. On appeal, Hetzel claims that seventy-two articles appeared in the local newspapers before her trial but informs us that twenty-four of these articles were published after January 1, 2001. Thus, the jurors were at most exposed to approximately three articles a month for the nine months preceding the trial. The passage of time and the sporadic nature of the coverage in the months proceeding the trial suggest that any prejudice that may have been presumed around the time of Guzman's death and Hetzel's arrest may have dissipated by the next year.

The record of voir dire also suggests that the publicity surrounding the case did not deprive Hetzel of her right to an impartial jury. During voir dire, slightly more than two-thirds of the seventy-five-person venire admitted that they had heard, seen, or read news coverage of the case. Yet, only two of these jurors stated that they had a fixed opinion about the guilt of the defendants, and both were stricken for cause. Five other jurors answered that they could not give the defendants or the Commonwealth a fair and impartial trial. The percentage of jurors who stated that they had a fixed opinion about the guilt of the defendants here (approximately 3%) is much lower than that in *Murphy* (26%) and *Patton* (77%), cases in which the Supreme Court rejected claims of prejudice. *See Murphy,* 421 U.S. at 803, 95 S.Ct. 2031; *Patton,* 467 U.S. at 1029, 104 S.Ct. 2885. Thus, the pretrial publicity did not have the effect of convincing the community of Hetzel's guilt.

Finally, Hetzel argues that the publicity focused on the lesbian relationships "in-and-of themselves created a hostile environment which precluded a rational trial process." Appellant's Br. at 28. However, Hetzel offers only speculation, and no evidence, to support the theory that knowledge of the lesbian relationship affected the impartiality of the jurors. She also recognizes that any jury, regardless of the venue, would have heard about her lesbian relationship with Guzman during the trial. Furthermore, Hetzel's attorney asked the venire whether they could remain impartial and judge Hetzel fairly even though she was bisexual. No one responded that they could not. There is simply no reason to presume prejudice on this record.

Hetzel has not established that the Superior Court's decision that the media coverage was not so "extensive, sustained, or pervasive," *Hetzel,* 822 A.2d at 764, so as to require a change of venue for her trial was an objectively unreasonable application of federal law. Therefore, we must affirm the District Court's order denying the writ of habeas corpus.

## IV.

For these reasons, the judgment of the District Court will be affirmed.