**LUIS MELENDEZ, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Crim. No. 2010-0071

Supreme Court of the Virgin Islands

February 2, 2012

245

247

BRUCE P. BENNETT, ESQ., Hunter Cole & Bennett, St. Croix, USVI, *Attorney for Appellant.*

TIFFANY V. MONROSE, ESQ., Department of Justice, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(February 2, 2012)

HODGE, *Chief Justice*. Luis Melendez was charged and convicted of two counts of first degree murder, four counts of attempted first degree murder, four counts of third degree assault, reckless endangerment, unauthorized possession of a firearm, and interference with an officer discharging his duty for his involvement in a shooting that occurred at a public housing community on Christmas morning in 2007. On appeal, Melendez challenges the admission of evidence seized from Jeffrey Browne's vehicle, statements made by his sister Marcella Browne, and the death certificates of two of the victims. He also claims that juror misconduct, as well as the Superior Court's failure to grant his motion for

a change of venue and to allow him to call several rebuttal witnesses, denied him a fair trial. For the reasons discussed below, this Court will affirm the judgment of the Superior Court.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

In the early morning hours on December 25, 2007, Marsela Jarvis, a resident of a public housing community in St. Croix, noticed a suspicious silver/grayish car driving slowly around the housing community with its headlights turned off. (J.A. Vol. V 130-32.) At the time she noticed the car, Jarvis was standing on the front porch of her apartment. She continued to watch the car circle around the housing community because there had been a high frequency of shootings occurring in that area. (J.A. Vol. V 132.) As the car passed by her apartment several times, Jarvis was able to identify two of its occupants. She testified that the driver of the vehicle was Jeffrey Browne, and that Luis Melendez was riding in the front passenger seat. (J.A. Vol. V 133-35.) She further testified that after circling around the housing community several times, Jeffrey[1] and Melendez drove towards a group of people who were hanging out in front of one of the housing community's apartment buildings. The car then turned on its headlights and Melendez fired four shots at the group of people from the passenger seat of the vehicle as the car passed the apartment building. (J.A. Vol. V 136-37.) Jeffrey then turned the car around, and as they passed by the group a second time Melendez — this time sitting in the window of the passenger seat with a long gun rested on the roof of the car — opened fire on the group again. (J.A. Vol. V 138-40.) When Melendez opened fire on the group of people, Jarvis testified that everyone in the area began to run for cover, but some of the people, including Allen Burke, appeared to "trip-up" and fall to the ground. (J.A. Vol. V 137-39.)

Multiple witnesses to the shooting, including Rodney Barbel, Adowa Flemming, and Euclyn Prentice, who were among the group of people hanging out in front of the apartment building when the shooting began, substantially corroborate Jarvis's testimony. (J.A. Vol. V 175-91, 199-

[1] To avoid confusion, we will use the first names of Jeffrey Browne and his wife Marcella Browne.

218.) Prentice and Flemming testified that although they could not identify any of the occupants of the vehicle that opened fire on them, they recognized the vehicle used in the shooting as belonging to Jeffrey and indentified Jeffrey and Marcella Browne's silver Hyundai Brio as that car.[2] (J.A. Vol. V 175-91, 199-218, 212, 255.) Nioka Shaw and Martika Jarvis each testified that they had witnessed parts of the shooting from their respective apartments in the housing community, and that they saw Jeffrey driving the car used in the shooting. (J.A. Vol. VI 31-32, 101-04.)

As a result of the shooting, Burke, Kennyetta McIntosh, Prentice, Flemming, and Jesus Serrano sustained gunshot wounds. (J.A. Vol. V 140-42, 235, 256.) Burke and McIntosh were severely wounded, lying on the ground, and bleeding. (J.A. Vol. V 140-42.) Burke died at the scene. (J.A. Vol. VI 106, 174-76, 181-82; Vol. IX 58, 63.) McIntosh was taken to the hospital, but died shortly thereafter. (J.A. Vol. IX 58-59.)

Members of the Virgin Islands Police Department (VIPD), in the late morning hours of December 25, discovered Jeffrey and Marcella Browne's silver Hyundai Brio parked at a public housing community, which is located relatively close to the housing community where the shooting occurred. (J.A. Vol. V 43-48.) The VIPD seized the vehicle and transported it to a secure facility while they awaited a search warrant. (J.A. Vol. V 43-48.) Later that evening the VIPD obtained a search warrant for the vehicle, which they subsequently executed on December 27, 2007. (J.A. Vol. V 48-49.) During the search of the vehicle, the VIPD discovered a bullet proof vest and a spent 12 gauge shotgun shell behind the rear passenger headrest, which was similar to the spent 12 gauge shotgun shells found at the scene of the shooting. (J.A. Vol. V 49-50.) Melendez was arrested and charged with two counts of first degree murder, four counts of attempted first degree murder, four counts of third degree assault, reckless endangerment, unauthorized possession of a firearm, and interference with an officer discharging his duty.[3] (J.A. 26.) A jury subsequently found him guilty of all charges, and the Superior Court entered judgment and sentence on October 5, 2010. (J.A. 23-27.)

---

[2] Barbel was not able to identify the occupants of the car involved in the shooting or the car itself.

[3] Jeffrey and Marcella were also arrested, charged, and convicted for their alleged involvement in the December 25, 2007 shooting. However, they have appealed separately and are not parties to this appeal.

Melendez filed his timely notice of appeal on September 2, 2010.[4] (J.A. 57-58.)

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

According to title 4, section 32(a) of the Virgin Islands Code, we possess jurisdiction "over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." Since the Superior Court's October 5, 2010 Judgment and Commitment constitutes a final judgment, this Court possesses jurisdiction over Melendez's appeal.

Our standard of review in examining the Superior Court's application of law is plenary, while findings of fact are reviewed only for clear error. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007). Likewise, when a case involves the interpretation of the United States Constitution, our standard of review is plenary.[5] *Latalladi v. People*, 51 V.I. 137, 141 (V.I. 2009).

### B. The Evidence Seized from Jeffrey's 2007 Hyundai Brio

Melendez first argues that the VIPD seized Jeffery's car without probable cause or a valid search warrant in violation of the Fourth Amendment. Accordingly, he contends that the Superior Court should have suppressed all evidence that was subsequently discovered from that vehicle. The People now argue that Melendez does not have an expectation of privacy in Jeffery's vehicle, and thus he lacks standing to challenge the seizure of the vehicle. Additionally, the People claim that

---

[4] *See* V.I.S.CT.R. 5(b)(1) ("A notice of appeal filed after the announcement of a decision, sentence, or order — but before entry of the judgment or order — is treated as filed on the date of and after the entry of judgment.").

[5] The Bill of Rights of the Constitution of the United States, contained in the Revised Organic Act of 1954 and statutorily conferred by Congress, "expresses the congressional intention to make the federal Constitution applicable to the Virgin Islands to the fullest extent possible consistent with its status as a territory." *In re Brown*, 439 F.2d 47, 50-51, 8 V.I. 313 (3d Cir. 1971).

the VIPD had probable cause to seize Jeffrey's vehicle and the trial court did not err in admitting the evidence discovered therein.[6]

As an initial matter, we must determine whether the People can assert for the first time on appeal that Melendez does not have standing to challenge the seizure of Jeffrey's vehicle. In *United States v. Butler*, 405 Fed. Appx. 652, 654 (3d Cir. 2010) (unpublished), the Court of Appeals for the Third Circuit held that if the government fails to raise the issue of standing in the trial court, the issue is waived on appeal. The court reasoned:

> Unlike Article III standing, which cannot be waived, Fourth Amendment standing can be waived if not raised and properly preserved. *See Rakas v. Illinois*, 439 U.S. 128, 140, 99 S. Ct. 421, 58 L.Ed.2d 387 (1978) ("[T]his Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."); *see also United States v. Washington*, 380 F.3d 236, 240 n.3 (6th Cir. 2004) (" 'Standing to challenge a search or seizure is a matter of substantive Fourth Amendment law rather than of Article III jurisdiction, meaning that the government can waive the standing defense by not asserting it.' " (quoting *United States v. Huggins*, 299 F.3d 1039, 1050 n.15 (9th Cir. 2002))); *United States v. Dewitt*, 946 F.2d 1497, 1499-1500 (10th Cir. 1991) ("[T]he issue of [F]ourth [A]mendment standing could be waived if the government has failed to raise it in a timely fashion during the litigation." (quotation marks and alterations omitted)).

---

[6] The People also argue that Melendez has failed to preserve this issue for appeal. However, we disagree. Although it was Jeffrey's attorney who filed the pre-trial motion to suppress and conducted the direct and cross examinations of witnesses at the June 18, 2008 suppression hearing, Melendez's attorney was present at that hearing and the trial court specifically stated in its July 23, 2008 order denying the pre-trial motion to suppress that "[o]n April 28, 2008, Jeffrey Browne filed a Motion to Suppress Evidence taken from his vehicle . . . in which Defendants Marcella Browne and Luis Melendez join." (J.A. 182.) Melendez further joined in Jeffrey's renewed objection to the admission of the evidence seized from the vehicle at trial. (J.A. Vol. V 61-62.) Finally, the trial court's September 22, 2010 order and memorandum opinion clearly indicates that Melendez joined in Jeffrey's motions for judgment of acquittal and a new trial, which also claimed that the trial court erred in admitting the evidence seized from his vehicle. (J.A. 274-310.)

*Id.* In addition to those cited in *Butler*, other federal circuits have also held that failing to raise the issue of standing in the trial court bars the government from raising it on appeal. *See United States v. Gonzalez*, 71 F.3d 819, 827 n.18 (11th Cir. 1996); *United States v. Mendoza*, 722 F.2d 96, 97 n.1 (5th Cir. 1983).[7] We agree with the majority of the Courts of Appeals that have addressed this issue and find that by failing to raise the issue of standing in the Superior Court, the People have waived the issue on appeal. *See Steagald v. United States*, 451 U.S. 204, 209, 101 S. Ct. 1642, 68 L. Ed. 2d 38 (1981) (warning that the government can "lose its right" to challenge "standing" "when it has made contrary assertions in the courts below . . . or when it has failed to raise such questions in a timely fashion during the litigation"). Accordingly, since the People failed to assert that Melendez lacked standing to challenge the seizure of Jeffrey's vehicle in the Superior Court, we deem this argument waived and proceed to the merits of Melendez's claim.

█ The Fourth Amendment prohibits unreasonable searches and seizures, and "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). One such exception is the automobile exception. Under the automobile exception to the warrant requirement, law enforcement may seize and search an automobile without a warrant if probable cause exists to believe it contains evidence of criminal activity. *Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S. Ct. 2485, 135 L. Ed. 2d 1031 (1996); *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002). "Probable cause exists when, under the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir.

---

[7] Some Courts of Appeals, however, have rejected the proposition that the government may waive the issue of standing. *See United States v. Bouffard*, 917 F.2d 673, 677 (1st Cir. 1990) (remanding to the district court to conduct a "standing" inquiry, notwithstanding the government's concession of the defendant's "standing" in the district court and on appeal, because "there is a clear insufficiency of evidence to demonstrate that the defendant possessed a legitimate expectation of privacy"); *see also United States v. Smith*, 621 F.2d 483, 489 n.3 (2d Cir. 1980) ("[S]tanding is a question of law and a concession by the Government on a question of law is never binding on this Court. Thus the Government is free to argue the question of Smith's standing even if it 'conceded' it during the proceedings below." (citation omitted)). Implicit in this view is that the government cannot waive its challenge to standing.

2000) (per curiam) (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). "The test of reasonableness cannot be fixed by *per se* rules; each case must be decided on its own facts." *Coolidge v. New Hampshire*, 403 U.S. 443, 510, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

▆ Applying that standard to the facts of this case, even assuming, although not deciding, that the police did illegally seize Jeffrey's vehicle, the evidence subsequently discovered pursuant to a valid warrant was nevertheless admissible because none of the information on which the warrant was secured was derived from or related in any way to the illegal seizure. Jeffrey's vehicle was seized at approximately 10 a.m. on December 25, 2007. Later that evening, however, the VIPD obtained a search warrant for Jeffrey's vehicle based on the affidavit of Officer Richard Matthews. In his affidavit, Officer Matthews states that one of the individuals who sustained gunshot wounds during the shooting identified the vehicle used in the shooting as belonging to Jeffrey. The individual further stated that he was familiar with Jeffrey's vehicle and that he had seen it in the vicinity of the housing community immediately prior to the shooting. Based on this information, it was reasonable for the police and the Superior Court judge issuing the warrant to believe that there was a fair probability that evidence of the shooting would be found in Jeffrey's vehicle.[8] After obtaining a search warrant, the VIPD searched Jeffrey's automobile on December 27, 2007.[9]

The facts of this case are similar to those presented to the United States Supreme Court in *Segura v. United States*, 468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984). There, the police had information of drug trafficking in a particular apartment. *Id.* at 800. Prior to obtaining a warrant, however, the police went to the apartment and conducted an illegal entry and seizure of the premises. *Id.* at 802. A warrant was later issued some nineteen hours after the illegal seizure of the premises based solely on information known to the agents before the illegal entry. *Id.* at

---

[8] Melendez has not challenged the validity of the search warrant or the actual search of Jeffrey's vehicle. Rather, he contends that the illegal seizure of Jeffrey's vehicle by the VIPD on December 25, 2007, prior to obtaining a search warrant and without probable cause, was unconstitutional, and that as a result, all evidence subsequently discovered in that vehicle was inadmissible.

[9] The search revealed a spent shotgun shell, which was similar to the spent shotgun shells found at the scene of the shooting. (J.A. Vol. V 49-50.)

801-02. The issue before the Supreme Court was whether the drugs and other evidence not observed during the initial illegal seizure, but first discovered by the police the day after the illegal seizure, under an admittedly valid search warrant, should have been suppressed. *Id.* at 804. The Court held that the evidence obtained pursuant to the authorized search was admissible notwithstanding the prior illegal seizure. *Id.* at 813-14. In reaching this conclusion, the Court reasoned:

> None of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment; the information came from sources wholly unconnected with the entry and was known to the agents well before the initial entry. No information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant. It is therefore beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged. This evidence was discovered the day following the entry, during the search conducted under a valid warrant; it was the product of that search, wholly unrelated to the prior entry. The valid warrant search was a "means sufficiently distinguishable" to purge the evidence of any "taint" arising from the entry. *Wong Sun*, 371 U.S. at 488. Had police never entered the apartment, but instead conducted a perimeter stakeout to prevent anyone from entering the apartment and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here. The legality of the initial entry is, thus, wholly irrelevant under *Wong Sun*, supra, and *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S. Ct. 182, 64 L. Ed. 319 (1920).

*Id.* at 814-15. The Court thus declined to apply the exclusionary rule because the illegal entry and seizure "did not contribute in any way to discovery of the evidence seized under the warrant." *Id.* at 815.

Similarly, in *United States v. Glover*, 9 Fed. Appx. 167, 169 (4th Cir. 2001) (unpublished), the police, without having obtained a search warrant, towed Glover's vehicle from a parking garage to the FBI vehicle impoundment lot. Several hours later the police applied for search warrants covering Glover's apartment and vehicle. *Id.* The judge issued a warrant as to the apartment, but denied a warrant for the vehicle. *Id.* The

police immediately executed a search of Glover's apartment, which produced incriminating evidence. *Id.* Using this additional evidence, the police were able to reapply and obtain a warrant for Glover's vehicle. *Id.* And the subsequent search of Glover's vehicle allowed the police to discover further incriminating evidence, which was used to convict Glover at trial. *Id.* at 170. On appeal, Glover argued that the impoundment of his car constituted an illegal seizure and this illegality tainted the evidence obtained during the subsequent search of the car, although the search itself was conducted pursuant to a valid warrant.[10] *Id.* at 168. The court concluded that the evidence discovered in Glover's car was admissible because the search was conducted pursuant to a properly issued search warrant and was supported by probable cause acquired independently of the contested impoundment.[11] *Id.* at 171-72. The court stated:

> As we have emphasized, the police did not acquire any information about the contents of Glover's car when they impounded it, and there was absolutely no causal nexus between the seizure and the subsequently issued search warrant. Had the police officers simply maintained their surveillance of Glover's car for several hours and impounded it after the apartment search had been completed, the car's contents would have been discovered and unquestionably admitted.

*Id.* at 172.

The facts of the case before us are similar to those in *Segura* and *Glover*. The evidence discovered in Jeffrey's car was obtained as the result of a search conducted pursuant to a warrant, which standing alone would have been unquestionably valid. In addition, "the police did not acquire any information about the contents of [Jeffrey's] car when they impounded it, and there was absolutely no causal nexus between the seizure and the subsequently issued search warrant." *See Glover*, 9 Fed. Appx. at 172. Thus, the search conducted pursuant to the valid warrant was a "means sufficiently distinguishable" to purge the evidence

---

[10] Glover's vehicle remained parked and secured on the FBI impoundment lot from the time it was initially impounded until the eventual issuance of the search warrant some four days later. *Id.* at 169 n.3.

[11] The court assumed, without concluding, that probable cause did not exist at the time the police impounded Glover's car. *Id.* at 170.

discovered in Jeffrey's car of any "taint" arising from the purported illegal seizure. *See Segura*, 468 U.S. at 814-15; *see also United States v. Charles*, 290 F. Supp. 2d 610, 617 (D.V.I. 1999). If the VIPD had simply maintained their surveillance of Jeffrey's car for several hours and impounded it after they had obtained the search warrant, the evidence in the vehicle would have been discovered and unquestionably admitted. *See Segura*, 468 U.S. at 815; *Glover*, 9 Fed. Appx. at 172. The illegality, if any, of the initial seizure is thus irrelevant, as the warrant was properly issued and free from any taint of the alleged illegal seizure of the vehicle.[12] *See Segura*, 468 U.S. at 815 ("[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence. Suppression is not justified unless the challenged evidence is in some sense the product of illegal governmental activity.") (internal quotation marks omitted). Therefore, we affirm the order of the Superior Court denying Melendez's motion to suppress evidence seized from Jeffrey's 2007 Hyundai Brio.[13] *See Segura*, 468 U.S. at 815.

## C. The Admission of Marcella Browne's Statement

■ Melendez next argues that the trial court erred in admitting a portion of Marcella Browne's February 4, 2008 statement that she made to the VIPD. He contends that the February 4, 2008 statement implicates him in the shooting. And since Marcella was a co-defendant at his trial and he was not able to cross-examine her about the statement, its admission into evidence violated his Sixth Amendment right to confront the witnesses against him. Melendez, however, failed to raise this issue in

---

[12] Our holding should not be read as sanctioning police conduct intended to hold a suspect's car without probable cause while the police attempt to gather additional information. Such conduct would be a clear violation of the Fourth Amendment. We hold only that evidence obtained even from an illegally seized vehicle is not subject to the exclusionary rule when it was subsequently discovered pursuant to a validly issued warrant and free from any taint of an illegal seizure.

[13] Melendez also appears to argue that the evidence seized from Jeffrey's vehicle should have been excluded because the VIPD failed to maintain a proper chain of custody over the key to Jeffery's vehicle. This argument, however, ignores the fact that the key to Jeffrey's vehicle was *not* evidence. Rather it was merely one of several means that the VIPD could have used to access Jeffrey's car. Moreover, "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 2532 n.1, 174 L. Ed. 2d 314 (2009); *United States v. Dent*, 149 F.3d 180, 188-89 (3d Cir. 1998).

the Superior Court. (J.A. Vol. IX 16-23.) Accordingly, before we will reverse the judgment of the Superior Court, Melendez must establish: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001); *accord Phipps v. People*, 54 V.I. 543, 546 (V.I. 2011).

■ The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. The Confrontation Clause affords criminal defendants both the right to confront and to cross-examine adverse witnesses. *See Maryland v. Craig*, 497 U.S. 836, 845-46, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) (holding the Confrontation Clause encompasses the right to "personal examination . . . [and] insures that the witness will give his statements under oath . . . [and] submit to cross-examination") (internal quotation marks and citation omitted). In *Crawford v. Washington*, the United States Supreme Court held that the Confrontation Clause prohibits the admission of an individual's testimonial statement against the accused when that individual does not appear at trial, "unless he [is] unavailable to testify, and the defendant [has] had a prior opportunity for cross-examination." 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). The Court further noted that custodial examinations and formal statements made to government officers clearly fall within the definition of a testimonial statement. *Id.* at 51.

■ In *Bruton v. United States*, the Court held that a defendant is deprived of his rights under the Sixth Amendment's Confrontation Clause when a non-testifying co-defendant's statement naming him as a participant in the crime is introduced at their joint trial, even if the trial court instructs the jury to consider the statement only against the non-testifying co-defendant. 391 U.S. 123, 136-37, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). The Court expanded on *Bruton* in *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), where it held that "the Confrontation Clause is not violated by the admission of a non-testifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." It further noted that "evidence [in a statement] requiring linkage differs

from evidence incriminating on its face in the practical effects which application of the *Bruton* exception would produce," and declined to extend *Bruton* to "confessions incriminating by connection." *Id.* at 208-09. Thus, when a co-defendant's extrajudicial statement does not directly implicate or explicitly suggest the participation of the defendant, the *Bruton* rule does not apply. *United States v. Richards*, 241 F.3d 335, 340-41, 43 V.I. 337 (3d Cir. 2001); *United States v. Belle*, 593 F.2d 487, 493 (3d Cir. 1979). Moreover, an "evidentiary linkage or contextual implication may not be utilized to convert a non-Bruton admissible statement into a Bruton inadmissible statement." *Belle*, 593 F.2d at 494.

The following portion of Marcella's February 4, 2008 statement was admitted at trial:

## NARRATIVE STATEMENT

Q: On February 4, 2008 were you advised of your Miranda Rights by Detective Cureene Smith?

A: Yes.

Q: Did you understand those rights?

A: Yes.

Q: Are you willing to make a statement?

A: Yes.

Q: On December 25, 2007, you were interviewed by Detective R. Matthews, C. Smith and I, at Marshall Command Police station, did you remember giving us a statement on that day?

A: Yes.

Q: In your statement you stated that you went with the vehicle from your house around "Twelvish" was that a true statement?

A: No.

In his brief, Melendez contends that Marcella's statement included the following question and answer:

259

Q: In your [December 25, 2007] statement you stated that you went with the vehicle from you [sic] house around "Twelvish" was that a true statement?

A: No.

Q: Did any[] of your family members or your husband told [sic] to make that statement?

A: Yes, I'm not saying who.

(Appellant's Br. 10.) Prior to its admission, however, the last question and answer were redacted and not included in the statement that was admitted into evidence at trial. Thus, on its face, this statement does not directly implicate or explicitly suggest that Melendez was involved in the shooting. By making the redaction discussed above, all possible references to Melendez were eliminated.

▇▇▇ The People also introduced into evidence Marcella's December 25, 2007 statement, in which she told police that on December 25, 2007, at approximately midnight, she had left her residence in her and Jeffrey's silver 2007 Hyundai Brio, and that when she left her house, Jeffrey and Melendez were there with her children. (J.A. Vol. IX 34.) While we recognize that viewing Marcella's February 4, 2008 statement in light of her December 25, 2007 statement could tend to suggest that Melendez may have been involved in the shooting, any possible "evidentiary linkage or contextual implication" that may have been drawn from viewing these statements together will not affect the admissibility of Marcella's February 4 statement because it does not expressly implicate Melendez in the shooting. *See Belle*, 593 F.2d at 493-94. "Statements that are incriminating only when linked to other evidence in the case do not trigger application of *Bruton's* preclusionary rule." *United States v. Vega Molina*, 407 F.3d 511, 520 (1st Cir. 2005) (citing *Richardson*, 481 U.S. at 208). Here, Marcella's February 4, 2008 statement is, at best, a "confession[] incriminating by connection." *See Richardson*, 481 U.S. at 208-09. Accordingly, Marcella's February 4, 2008 statement was admissible under *Bruton*.

▇▇▇ Despite our conclusion that Marcella's February 4, 2008 statement was admissible under *Bruton*, the trial court nevertheless erred in failing to instruct the jury that Marcella's statement could only be used as

evidence against her and not against Melendez. It is clear from Supreme Court case law "that the trial court ordinarily should instruct the jury that one defendant's out-of-court [statement] may not be used against his codefendants in a joint trial." *See Vega Molina*, 407 F.3d at 521 (citing *Gray v. Maryland*, 523 U.S. 185, 192, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998); *Richardson*, 481 U.S. at 206; *Bruton*, 391 U.S. at 137). Thus, the Superior Court's failure to give such an instruction in this case, where the confession was not independently admissible against Melendez, constituted error that, given the state of the law, was obvious. *See id.*

We cannot conclude under the circumstances, however, that the trial court's obvious error in failing to instruct the jury that Marcella's statement could not be used as evidence against Melendez affected his substantial rights. As discussed above, Marcella's statement was not inculpatory on its face, and it did not directly implicate or explicitly suggest that Melendez was involved in the shooting. Further, the portion of Marcella's statement involving Melendez was completely removed, which left the jury unaware of the redaction. Whatever incriminating value Marcella's statement may have had with respect to Melendez's involvement in the shooting was derived by inference from other evidence introduced at trial.

 Additionally, the People presented substantial evidence implicating Melendez in the shooting. Video surveillance from a casino in St. Croix showed Jeffrey and Melendez entering the casino together, and then leaving together less than an hour before the shooting. (J.A. Vol. III 84-90; Vol. IV 40.) Marsela Jarvis testified that she witnessed the shooting and indentified Melendez as the individual who perpetrated the shooting. She further identified Jeffrey's silver Hyundai Brio as the car involved in the shooting.[14] This testimony was corroborated by multiple other witnesses to the shooting who also identified Jeffrey's car as the car used

---

[14] Specifically, Jarvis testified that Melendez was riding in the front passenger seat of Jeffrey's silver Hyundai Brio, and that he fired four shots at a group of people who were in front of one of the housing community's apartment buildings as the car passed the apartment building. She further testified that Jeffrey then turned the car around, and as they passed by the group a second time Melendez — this time sitting in the window of the passenger seat with a long gun rested on the roof of the car — opened fire on the group again.

in the shooting.[15] Finally, the VIPD discovered a spent 12 gauge shotgun shell behind the rear passenger headrest of Jeffrey's car that was similar to the spent 12 gauge shotgun shells found at the scene of the shooting. Based on this evidence, combined with the fact that Marcella's statement was at most weakly inculpatory as to Melendez, we are convinced beyond a reasonable doubt that the Superior Court's failure to give the jury a *Bruton* instruction was harmless and did not contribute to the verdict obtained. *See Vega Molina*, 407 F.3d at 521. Therefore, the trial court's decision to admit a portion of Marcella's statement without instructing the jury that Marcella's statement could only be used as evidence against her and not against Melendez does not constitute plain error.

## D. The Admission of Burke and McIntosh's Death Certificates

Melendez, as he did below, also argues on appeal that the trial court erred in admitting the death certificates of Burke and McIntosh into evidence. He contends that one of the key elements that must be established in order to convict a defendant of murder is that the he actually killed a human being. *See* 14 V.I.C. § 921 (defining murder as the "the unlawful *killing of a human being* with malice aforethought.") (emphasis added). In order to establish that Burke and McIntosh died from gunshot wounds sustained from the December 25, 2007 shooting, the People introduced two death certificates prepared by Doctor D'Michelle P. DuPre, the medical examiner, stating that Burke and McIntosh died in the early morning hours on December 25, 2007 of multiple gunshot wounds. (J.A. 586-87; Vol. IV 108.) Dr. DuPre further classified their deaths as homicides. (J.A. 586-87.) However, Dr. DuPre did not testify at trial and Melendez objected to the admission of the death certificates on multiple grounds, including his right to cross-examine Dr. DuPre. (J.A. Vol. IV 102.) The trial court overruled Melendez's objection and admitted the death certificates into evidence. On appeal, Melendez reasserts that the admission of the death certificates into evidence without allowing him to cross-examine the individual who prepared those documents violated the Sixth Amendment's Confrontation Clause. He argues that the death certificates are the functional equivalent to in-court testimony, and since he did not have the opportunity to

---

[15] Several of these witnesses also identified Jeffrey as the driver of the car, although only Jarvis was able to identify Melendez as one of the car's occupants.

cross-examine their author, Dr. DuPre, they are inadmissible under the Confrontation Clause.

As discussed above in part II.C., the Confrontation Clause bars admission of testimonial evidence unless the declarant is unavailable to testify and the accused has had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 53-54. The Supreme Court has held that in order for a statement to qualify as "testimonial," it must have a "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution." *See Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006); *see also Bullcoming v. New Mexico*, ___ U.S. ___, 131 S. Ct. 2705, 2714 n.6, 180 L. Ed. 2d 610 (2011). In *Melendez-Diaz v. Massachusetts*, the Court addressed whether affidavits reporting the results of forensic analysis were "testimonial," rendering the affiants "witnesses" subject to the defendant's right of confrontation under the Sixth Amendment. 557 U.S. 305, 174 L. Ed. 2d 314, 129 S. Ct. 2527, 2530 (2009). The evidence at issue identified a substance seized by law enforcement officers and linked to the defendant as cocaine. *Id.* The Court determined that forensic analyses qualify as "testimonial" statements, and forensic analysts are "witnesses" to which the confrontation clause applies. *See id.* at 2532. In reaching this conclusion, the Court focused on the fact that the laboratory report was used to establish a fact that was necessary to convict. *Id.* at 2533-34. The Court further specifically referenced autopsy examinations as one such kind of testimonial forensic analysis. *See id.* at 2536 n.5.

Based on the Supreme Court's decisions in *Crawford* and *Melendez-Diaz*, we conclude that the introduction of the death certificates of Burke and McIntosh violated the Sixth Amendment's Confrontation Clause. *See id.* at 2536-37; *State v. Locklear*, 363 N.C. 438, 681 S.E.2d 293, 304-05 (N.C. 2009). As a medical examiner in this Territory, Dr. DuPre was employed by the Department of Justice and the Attorney General, and empowered by statute "to make inquiry into unnatural deaths" and "to investigate the death of every person" in cases in which it appears to be "a violent death," "a death caused by unlawful act or criminal neglect," or "a death occurring in a suspicious, unusual or unexplained manner." V.I. CODE ANN. tit. 3, § 115(a). When Dr. DuPre prepared these death certificates she must have been aware that Burke and McIntosh had been the victims of a shooting. A simple visual inspection would have revealed that their bodies had sustained significant wounds

from gunshots. Moreover, section 115(b) required the VIPD to report the deaths of Burke and McIntosh to the medical examiner, which would have required her to go to the scene of the shooting to take custody of Burke's body. *See* 3 V.I.C. § 115(b) ("When the Medical Examiner is so informed of a death within his jurisdiction he shall go at once to the place where the body is and take charge of it."). It could not have escaped Dr. DuPre's notice that her autopsy findings regarding the cause of death of Burke and McIntosh "would likely be used in a criminal homicide investigation and at any resulting judicial proceeding." *See United States v. Williams*, 740 F. Supp. 2d 4, 7 (D.D.C. 2010) (holding autopsy report and death certificate are testimonial and inadmissible under the Confrontation Clause unless the author is subject to cross-examination at trial). This conclusion is further supported by the fact that Dr. DuPre listed "multiple gunshot wounds" as the causes of death and characterized the deaths as homicides. The fact that Dr. DuPre characterized the deaths of Burke and McIntosh as homicides, as opposed to accidents or undetermined, indicates that her investigation had gone beyond merely examining their bodies. Thus, although Dr. DuPre may not have completed Burke and McIntosh's death certificates solely for use in a future prosecution, there can be no doubt that she was aware that her report "would be available for use at a later trial." *See Crawford*, 541 U.S. at 52.

Additionally, the death certificates of Burke and McIntosh "are marked by a formality characteristic of documents to be introduced in court." *See Williams*, 740 F. Supp. 2d at 7 (citing *Melendez-Diaz*, 129 S. Ct. at 2543 (Thomas, J., concurring)). The death certificate of each of the individuals is a standard form with typed headings and space provided for the pathologist to record information such as the decedent's name, Social Security number, next of kin, and cause of death, among other details. The medical examiner further signs this document certifying that "[o]n the basis of the examination of the body and/or the investigation, in my opinion, death occurred on the date and due to the causes stated." The death certificates thus "bear the hallmarks of official documents, making 'solemn declaration[s] or affirmation[s] . . . for the purpose of establishing or proving some fact.' " *Id.* at 8 (quoting *Melendez-Diaz*, 129 S. Ct. at 2532). And since the People failed to show that Dr. DuPre was unavailable to testify and that the defendant had been given a prior opportunity to cross-examine her, admitting the death certificates into

evidence violated Melendez's constitutional right to confront the witnesses against him.[16]

The admission of the death certificates in this case, however, was harmless because we are convinced beyond a reasonable doubt that their admission into evidence at trial did not contribute to the verdict obtained. *United States v. Hardwick*, 544 F.3d 565, 574 (3d Cir. 2008). The death certificates were introduced to establish that Burke and McIntosh died as a result of multiple gunshot wounds that they sustained from the December 25, 2007 shooting. However, even ignoring the death certificates, we find that the People presented copious evidence that Burke and McIntosh died as a result of the shooting. Multiple witnesses testified that Burke and McIntosh were both shot during the shooting. Sergeant Dino Herbert further testified that he personally observed Burke's body at the scene of the shooting shortly after the incident and McIntosh's body at the hospital a few hours later, and that both individuals were deceased.[17] (J.A. Vol. IX 58-59, 63.) This evidence establishes beyond a reasonable doubt that Burke and McIntosh died as a result of multiple gunshot wounds that they sustained in the shooting on December 25, 2007 at the housing community, and the erroneously admitted death certificates regarding Burke and McIntosh's causes of death would not have influenced the jury's verdict and were therefore harmless.[18] *See Locklear*, 681 S.E.2d at 304 (holding erroneous admission of autopsy report that tended to establish decedent's cause of death was harmless error).

---

[16] We recognize that since the Virgin Islands Code requires certificates of death to be filed with the registrar of vital statistics for all deaths occurring in the Virgin Islands, *see* 3 V.I.C. § 418(a)(12); 19 V.I.C. §§ 861, 866, 1703, death certificates would be admissible as an exception to the hearsay rule by virtue of Federal Rule of Evidence 803(9), even though its author is available, *see* FED. R. EVID. 803(9) (records of vital statistics exception to rule against hearsay). However, the United States Supreme Court has clearly held that in addition to qualifying under an exception to the hearsay rules, a statement must also be non-testimonial in order to be admissible absent confrontation. *See Melendez-Diaz*, 129 S. Ct. at 2539-40 (holding that even if a statement qualifies for admission under an exception to the hearsay rules, if it is testimonial its maker is subject to confrontation under the Sixth Amendment).

[17] Pictures of Burke's body at the crime scene verify that he died immediately after the shooting. (J.A. Vol. VI 174, 181-82.)

[18] Melendez also argues that the death certificates were not legally valid and should not have been admitted into evidence because Dr. DuPre was not licensed to practice medicine in the Virgin Islands when she prepared the death certificates. Since the admission of the death certificates was harmless, however, we need not address this issue.

## E. Melendez's Right to Call Rebuttal Witnesses

Melendez contends that the trial court erred when it prohibited him from calling several witnesses to rebut testimony given by several of the People's witnesses. He claims that he was prohibited from calling 1) Dr. Thelma Watson, who would have testified that Dr. DuPre was not licensed to practice medicine in the Virgin Islands and thus not permitted to issue death certificates for Burke and McIntosh; 2) Officer Rolando Huertes, who would have refuted Edwin Estien's testimony; 3) Patricia Schrader-Cooke, Estien's attorney, who would have testified that Estien had an incentive to testify against Browne; and 4) assorted 9-1-1 dispatchers, who would have testified that there were several 9-1-1 calls received on December 25, 2007, which gave conflicting descriptions of the vehicle involved in the shooting. Contrary to Melendez's argument, however, there is no indication from the record that he ever attempted to call any of these witnesses or that the trial court prohibited him from doing so. Accordingly, we find his argument meritless.

## F. Change of Venue

Melendez also argues that the trial court denied him of his constitutional right to a fair trial when it failed to grant his motion for a change of venue. However, there is no indication from the record that Melendez ever made a motion for a change of venue. Instead, it appears that Melendez is arguing that the Superior Court should have granted Jeffrey's motion for a change of venue, and then transferred his case *sua sponte* based on the evidence presented by Jeffrey.[19] Because Melendez failed to move the Superior Court for a change of venue, we will review only for plain error.

█ This Court has previously recognized that the Virgin Islands Code "authorizes 'a judge of the Superior Court . . . with the approval of the presiding judge,' to 'transfer any action or proceeding pending in one judicial division to the other judicial division for hearing and determination' if such a change in venue is 'in the interest of justice.' " *In re People*, 51 V.I. 374, 391 (V.I. 2009) (quoting 4 V.I.C. § 78). The United States Supreme Court has held that "[t]he Sixth Amendment

---

[19] Although Jeffrey filed a pretrial motion for a change of venue, Melendez failed to join in that motion or file his own motion for a change of venue.

secures to criminal defendants the right to trial by an impartial jury," *Skilling v. United States*, 561 U.S. ___, 130 S. Ct. 2896, 2912-13, 177 L. Ed. 2d 619 (2010), and "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity." *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). Intense pretrial publicity will only constitutionally require a change of venue, however, in cases where it creates "such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984). A presumption of prejudice is warranted only in extreme cases. *Skilling*, 130 S. Ct. at 2915. Courts should thus presume prejudice only in situations where the "media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process." *Rock v. Zimmerman*, 959 F.2d 1237, 1252 (3d Cir. 1992) (en banc), *overruled on other grounds by Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). "[W]hen evaluating whether the pretrial publicity violated the defendant's right to an impartial jury, we are to consider the content, quantity, and timing of the publicity." *Hetzel v. Lamas*, 372 Fed. Appx. 280, 283 (3d Cir. 2010) (unpublished) (citing United States Supreme Court cases). We "may also look to the record of voir dire to examine the effect of the publicity on the venire." *Id.*

In Jeffrey's pretrial motion for a change of venue, he points to eight newspaper articles from the *St. Croix Source* and *St. Croix Avis*, as well as a disruption that occurred during a release hearing related to his case.[20] (J.A. 347-60.) Based on these facts, Melendez claims that he was unable to receive a fair trial in St. Croix, and that the Superior Court erred

---

[20] In his appellate brief, Melendez also points to a May 1, 2008 *Avis* article indicating that the family of one of the victims was upset at the Superior Court's initial decision to transfer Melendez's case to St. Thomas and the rumors and speculation surrounding the death of the trial judge presiding over the case to support his argument that the trial court erred in failing to transfer his case to St. Thomas. However, there is no indication from the record that these issues were ever presented to the trial court, either by Jeffrey or Melendez. Furthermore, Melendez has not included a copy of the *Avis* article in his Joint Appendix on appeal. Nor has he included anything relating to any speculation or rumors surrounding the trial judge's death that would prejudice his ability to receive a fair trial on St. Croix. In fact, it is not even clear from Melendez's brief what speculation or rumors connected his pending case and the trial

in not transferring his case to St. Thomas. Reviewing the eight newspaper articles included in Jeffrey's pretrial motion for a change of venue, we are not persuaded that there was a reasonable likelihood that pretrial publicity precluded Melendez from receiving a fair trial. To begin, all of the articles included in Jeffrey's motion were published between December 25, 2007 and March 7, 2008, which was approximately eighteen months before jury selection.[21] Of those eight articles, two do not even mention Melendez's name. (J.A. 347, 357.) Another focuses almost exclusively on one of the victims, and only briefly mentions that Melendez was arrested and charged with the shooting that caused his death. (J.A. 356.) The remaining five articles objectively report on Melendez's arrest and subsequent advisement of rights, arraignment, and bail proceedings. Each of the articles focuses on what occurred at the Superior Court proceeding and only provides enough background information concerning the shooting as is necessary to familiarize the reader with the basic facts. They disclosed that a shooting occurred at the housing community in the early morning hours on Christmas day and that two individuals died as a result of the shooting, while four others were injured. The articles further indicate that Melendez had been arrested and charged for his alleged participation in the shooting. Nothing in these articles can be read as sensational, inflammatory, or slanted toward convictions. For example, the articles did not reveal whether Melendez has a prior criminal record or refer to any confessions, admissions, or other incriminating evidence implicating him in the shooting. Instead, the articles are factual and objective. Accordingly, we cannot conclude that these eight articles that were published more than eighteen months prior to jury selection are sufficient to establish that the pretrial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated. *See Hetzel*, 372 Fed. Appx. at 284 (holding seventy-two articles — the majority of which

---

judge's death. Accordingly, we decline to consider this information in reviewing the trial court's failure to transfer Melendez's case. *See United States v. Moorhead*, 18 V.I. 431, 433 (D.V.I. 1981) (holding that a defendant who moves for a change of venue "has the burden of placing on the record material which will show a reasonable likelihood of prejudicial publicity precluding a fair trial.").

[21] It should also be noted that four of the eight articles cited by Jeffrey were written within a week of the shooting.

were published over a year before jury selection — that were mostly factual, objectively reported, and did not contain incriminating evidence were not sufficient to establish a presumption of prejudice).

■ Melendez also points to an incident that allegedly occurred at his December 31, 2007 advisement of rights hearing to support his contention that the pretrial publicity surrounding his case was highly inflammatory and prejudiced the entire St. Croix community against him. He claims that the trial court was required to empty the gallery of the courtroom on December 31, 2007, in response to the outrage of the public in attendance, which interrupted the proceedings on several occasions. However, Melendez has failed to direct this Court to any part of the record that specifically addresses the facts surrounding the December 31, 2007 advisement of rights hearing and how it showed that he could not receive a fair trial in St. Croix. In fact, the only mention of the December 31, 2007 courtroom disruption is found in the trial court's June 5, 2008 order denying Jeffrey's motion for change of venue. In that order, the trial court noted:

> The Court remains mindful of a disruption which occurred at an earlier stage of this case when a release hearing was closed to the public. Subsequent hearings have passed without incident so that, while any subsequent disruptions may cause the Court to revisit the issue of transfer, at this stage the Court cannot say with certainty that any further such disruptions will occur.

(J.A. 195) This Court cannot conclude that the actions of an unspecified amount of people at a pretrial proceeding on December 31, 2007 is sufficient to show that there was a reasonable likelihood that Melendez was precluded from receiving a fair trial in September 2009. The trial court, therefore, did not err in failing to transfer Melendez's case *sua sponte*.

### G. Juror Misconduct

As Melendez's final argument .on appeal, he contends that two jurors failed to fully disclose certain facts during the jury selection process, which prevented him from selecting a fair and impartial jury. Melendez first claims that juror number 148 indicated on the jury questionnaire that she was related by blood or marriage to a person in law enforcement, but failed to identify what relationship she had with this person. He also

269

claims that juror number 137 failed to disclose that her brother is an officer with the VIPD, that her niece works at the Superior Court as a marshal, and that her sister is a corrections officer with the Bureau of Corrections. Melendez thus claims that the failure of these jurors to disclose this information during *voir dire* prevented him from adequately selecting a fair and impartial jury. This argument, however, ignores the facts in the record.

■ To receive a new trial because a prospective juror failed to answer a *voir dire* question appropriately, the defendant "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984); *United States v. Hodge*, 321 F.3d 429, 441 (3d Cir. 2003). *See Dowdye v. People*, 55 V.I. 736, 759 (V.I. 2011). Moreover, while motives for concealing information may vary, "only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556.

■ Here, Melendez has failed to demonstrate that either juror number 137 or juror number 148 failed to answer honestly a material question during *voir dire*. In completing the jury questionnaire, juror number 137 and juror number 148 both indicated that they were related by blood or marriage to a person in law enforcement, but left blank the section of that question that asked "how is that person(s) related to you." (J.A. 197-200.) Additionally, juror number 137 indicated that she was related by blood or marriage to a person who had worked for one of the Virgin Islands courts or agencies involved with criminal prosecutions, but left blank the section of that question that asked "how is that person(s) related to you." During *voir dire*, however, the trial court asked the jury panel: "Is there anyone on this panel who has a family member or close friend who is currently employed, previously employed with the Department of Justice, Office of the United States Attorney or any other agency involved with criminal prosecution and law enforcement?" (J.A. Vol. I 90.) In response, juror number 137 informed the court and the parties that she had a brother that is a police officer, a niece that is a marshal, and a sister that is a corrections officer. (J.A. Vol. I 101.) Juror number 148 also informed the court and the parties that her brother-in-law is a lieutenant in the police

department.[22] (J.A. Vol. I 104.) Melendez failed to inquire further regarding these relationships, despite being given the opportunity by the trial court. (J.A. Vol. II 198-99, 231.) Thus, his argument that juror number 137 and juror number 148 failed to fully disclose material facts during the jury selection process is directly contradicted by the record, and the trial court did not err in rejecting this argument.

## III. CONCLUSION

Even if the VIPD illegally seized Jeffrey's vehicle, the trial court did not err in admitting the evidence discovered from a subsequent search of the vehicle because the search was conducted pursuant to a properly issued warrant and supported by probable cause acquired independently of the illegal impoundment. The trial court's failure to instruct the jury that Marcella's statement could only be used as evidence against her and not against Melendez constituted plain error. Additionally, the introduction of Burke and McIntosh's death certificates violated the Confrontation Clause. The trial court's error in admitting the death certificates, however, was harmless. Melendez has also failed to demonstrate that that there was a reasonable likelihood that pretrial publicity precluded him from receiving a fair trial in St. Croix or that either juror number 137 or juror number 148 failed to answer honestly a material question during *voir dire*. Therefore, we affirm the judgment of the Superior Court.

---

[22] Both jurors further indicated that their family members' employment would not have an effect on how they viewed the evidence; that they could put aside their family members' employment and be fair and impartial to both sides in rendering a verdict; and that they could render a verdict based solely on the evidence presented during trial. (J.A. Vol. I 101-04.)