**NEVILLE POTTER, Appellant/Defendant**

**v.**

**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2011-0063

Supreme Court of the Virgin Islands

June 15, 2012

LESLIE LEVI PAYTON, ESQ., The Payton Law Firm, St. Thomas, USVI, *Attorney for Appellant.*

■■■■■ ■■■■■■ ■■■■■■ ■■■■■

PAMELA R. TEPPER, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice*.

## OPINION OF THE COURT

(June 15, 2012)

HODGE, C.J. Neville Potter appeals from a September 20, 2011 Judgment and Commitment of the Superior Court of the Virgin Islands, adjudging him guilty of six counts, including two counts of murder in the first degree; one count of assault in the third degree; and three counts of unauthorized possession of a firearm during the commission of the predicate offenses.[1] For the reasons that follow, we affirm.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

On February 8, 2009, Marvis Chamaro and Jack Diehl were shot and killed in the Mandahl Bay area of St. Thomas, U.S. Virgin Islands. Neville Potter was charged with their murders. From the testimony provided at trial,[2] it was established that Chamaro and another man, Kyle Gumbs, went to the area of the Mandahl circle in St. Thomas in the early afternoon of February 8, 2009, to smoke marijuana. They were sitting in Chamaro's vehicle when they saw what Gumbs described as a dark blue, four-door Toyota Corolla. There were two people in the Corolla, and the driver stepped out. He was holding a firearm and ordered Chamaro and Gumbs to exit their vehicle. They did so, and the suspect began to shoot at them. They ran into the bush. Gumbs escaped, but Chamaro was shot and killed.

---

[1] Violations respectively of V.I. CODE ANN. tit. 14, §§ 921, 922(a), § 297(2); and § 2253(a). The jury found Potter not guilty of attempted first degree murder and the accompanying possession charge in Counts XIII and XIV. The jury found Potter guilty of additional counts but, in its Judgment and Commitment, the court merged these with other counts. (J.A. 31-36 (merging a second degree murder count (Count III) and a first degree assault count (Count V), and the accompanying possession charges (Counts IV and VI), with the first degree murder conviction and possession convictions in Counts I and II; and merging another second degree murder count (Count IX) and first degree assault count (Count XI), and the accompanying possession charges (Counts X and XII), with the first degree murder conviction and unauthorized possession convictions in Counts VII and VIII).)

[2] Neither Potter nor the People provided a full transcript of the trial. Consequently, the facts as stated herein are necessarily limited to that which appears in the appellate record.

In his house nearby, Jack Diehl heard the shots. He instructed his son, Cullen Diehl, to remain in the home, and he left in his vehicle to investigate. (S.A. 99.)[3] Not long after, Cullen heard what he thought was the sound of a rockslide and, looking outside, he saw two men running down a hill away from his house. (S.A. 103.) He described one of those men as a black male, with short braids or dreads, wearing a black t-shirt. (S.A. 103.) Cullen then heard a "few very loud shots," and ducked back inside his house. (S.A. 105.) Cullen's mother subsequently received a phone call from a neighbor advising her that Jack had been shot. (S.A. 106.) Jack was taken to the hospital where he died of his injuries. (S.A. 108.) A few days later, the police showed Cullen photographs of potential suspects, but he could not identify the shooter. (S.A. 104.)

James John, another witness, was a friend and neighbor to Jack and his family. (S.A. 118.) John heard a number of shots coming from the driveway area outside his house. (S.A. 120, 122.) Looking out his window, he saw a man jump over his truck and slip as he ran away. (S.A. 124.) At that point, John saw that the man had a gun and was able to "glimpse" his face. (S.A. 124.) John described him as an African-American with shoulder-length braids, a black or grey t-shirt, and dark-colored, three-quarter length jeans. (S.A. 130.) John then heard his father call for him, so he ran outside and helped his father and brother put Jack in the truck and take him to the hospital where he later died. (S.A. 132-33.)

The police showed John a photo array a few hours after the incident. (S.A. 143.) When the police showed him the photographs in the array, they asked him if he could identify the man he saw on his property. (S.A. 149.) John identified Neville Potter as the assailant, selected him from the photo array, and later testified that he was "9.5 out of 10" certain that Potter was the shooter. (S.A. 151.) John testified that none of the officers suggested to him whom he should pick from the array, nor did they tell him whether he was correct about his selection. (S.A. 151.)

On September 2, 2010, Potter filed a Motion to Suppress Suggestive Pretrial Identification, which the People opposed on October 4, 2010. The

---

[3] On April 10, 2012, the Court granted the People's request to file a Supplemental Appendix in this case. The notation "S.A." refers to the Supplemental Appendix filed on March 16, 2012. The Joint Appendix, filed by Potter on February 23, 2012, is denominated "J.A." throughout this Opinion.

court held a suppression hearing on October 7, 2010. At the hearing, the investigating detective stated that after the shooting the police arranged a photo array, which included a picture of Potter, and that Gumbs and John identified Potter as the shooter. (J.A. 466.) The court ultimately denied Potter's Motion to Suppress. (S.A. 339).

After a six-day day trial, which began on March 7, 2011, the jury stated that it was deadlocked and the court declared a mistrial on March 12, 2011.[4] The People informed the court that they would pursue a retrial. On April 29, 2011, Potter filed a Motion for Change of Venue, which the People opposed. The court decided the Motion on May 13, 2011.[5] Although it denied the Motion for a Change of Venue, the court did issue an Order for a "Quasi Change of Venue," stating that the jury would be selected from St. Croix and brought to St. Thomas for the trial.

The second trial began on July 26, 2011. On that date, however, the jury gave the court a note in which its members complained about the quality and diversity of the breakfast meal and about the amount of their pay.[6] (J.A.45-46.) The court held a pretrial conference, at which it noted that the jurors' fee is set by statute, and that the court had already expended a great deal of money on the trial transporting the jurors to St. Thomas.[7] Potter's attorney expressed concern, stating that "it brings negative senses to my mind that if they are not treated properly by this

---

[4] It appears from the docket entries that the court orally declared a mistrial on March 12, 2011, and embodied this declaration in an Order signed and entered on March 14, 2011.

[5] The Order was not entered until May 24, 2011. Potter appealed the Order, but this Court dismissed the appeal for lack of jurisdiction on June 8, 2011. *Potter v. People*, S. Ct. Crim. No. 2011-0038.

[6] The note, which all of the jurors apparently signed, stated:

> Good morning, Judge Hollar. We, the jury, are requesting an increase in our pay to $80 a day. The current $40 a day is not suitable for the conditions we are placed in. Also, the breakfast was unacceptable. We would like cocoa tea [hot chocolate], bottled water, green tea, yogurt, scrambled eggs, boiled eggs, hot bread — white and wheat, salt fish, fruits — bananas, apples, oranges, pineapples, grapes, pancakes, bacon, turkey bacon, sausage, cheese. Do not put the cheese in the bread. P.S. Breakfast is the most important meal of the day. Looking forward to your cooperation. Thank you.

(J.A. 45-46.)

[7] The court stated that it rented an aircraft, at a round trip cost of $9,000 and that it was paying $149 per hotel room per night, for sixteen rooms. (J.A. 47.) The court also acknowledged that it was on an "austerity program" because of the poor financial condition of the government in general. (J.A. 54.) The court noted that the jury's breakfast consisted of cereal, quiche, Danishes, dumb bread, coffee, tea and "some other things." (J.A. 69, 84, 94.) Because it was

court they may not give a fair verdict." (J.A. 49.) Potter's attorney then requested that the court "disband" the jury and select another. The People at first indicated that if the jury was dissatisfied, it was just as likely to hold it against the People, so any possible prejudice cut both ways, and the People indicated that they were ready to proceed. (J.A. 49-50.) However, the People eventually indicated that they would like the court to inquire of each juror individually whether they would be able to perform their duties as jurors even if their demands were not met. (J.A. 52.)

The court granted the People's request and questioned each juror individually. All of the jurors maintained that they could still be impartial despite their misgivings over the cuisine and rate of pay. Nevertheless, Potter renewed his objection to the jury. (J.A. 145.) The People, after conferring with the Attorney General, indicated that although the jurors' complaints were "not earth shattering," the People were nonetheless concerned about the consequences on appeal. (J.A. 147.) The People noted that some jurors appeared hesitant when they stated that they could be impartial, and noted that "[t]he Attorney General takes his obligation to provide a fair trial to the defendant very seriously."[8](J.A. 147-48.) Consequently, at first the People did not oppose Potter's request to strike the panel, and later they made their own motion to strike the jury. (J.A. 148, 160, 166.) In the alternative, the People requested that the court

---

not raised below or on appeal, we need not decide in this case whether the court's emphasis on the costs of the proceedings could tend to coerce a jury to reach a verdict more quickly than they otherwise might after a thorough deliberation. *Cf. United States v. Fioravanti*, 412 F.2d 407, 420 (3d Cir. 1969) (exercising the court's supervisory power over the federal district courts to prohibit a court from issuing charges to a potentially deadlocked jury that they, especially the dissenting jurors, should make additional efforts to come to a consensus). *But see Allen v. United States*, 164 U.S. 492, 501-02, 17 S. Ct. 154, 41 L. Ed. 528 (1896) (declining to reverse a conviction after the trial court gave what is now referred to as an *"Allen charge"*).

[8] The People also noted the conflict between the jurors' sworn obligation to follow the law on the one hand, and, on the other, the admission by some members of the jury that they knew their fee was set by statute but nonetheless asked the court to give them more. (J.A. 155, 161-66.) However, the People have not filed a cross-appeal in this case. Potter did not raise this specific argument either below or on appeal. However, in any case, we find that the jurors' representations to the court that they would be able to hear the case and making an unbiased determination on the question of Potter's guilt, and the fact that most of the jurors appeared surprised during the voir dire to hear that the fee was set by statute, relieve any concern that the jury would have been unwilling or unable to follow the law as it was given to them.

strike three particular jurors who had hesitated or seemed ambivalent during the colloquy. (J.A. 156.) The court declined to strike the entire jury but did strike the three jurors requested by the People. (J.A. 173-74.)

The trial proceeded. A number of witnesses testified for the People, including Nicole Potter, Appellant's sister, who testified that she had lent her car — a black Toyota Corolla — to Neville Potter on the day Camacho and Diehl were murdered. (J.A.185-86.) Potter's counsel argued to the jury that since Gumbs stated he saw a dark blue Corolla, not a black one, the jury should either conclude that it was not Nicole Potter's vehicle, or discount Gumbs' testimony entirely.

During summation, the court granted the request of the attorney for the People to permit him and the case agent to stand up in front of the jury. Counsel noted that one of these two men was wearing a navy blue suit and the other was wearing a black suit. (J.A. 218.) Through this demonstration, the People attempted to establish that it would be reasonable to mistake a dark blue color for a black color and, therefore, if Gumbs said he saw a dark blue car when it was in fact black, such an error should not cause the jury to discredit his testimony. (J.A. 218.) Then, during his closing argument, Potter's counsel also attempted to have the People's counsel and case agent, as well as Potter himself, stand up to make a similar demonstration. (J.A. 231.) The People objected that for conflict of interest reasons, they could not be used in Potter's defense, and the court expressed concern about giving a defendant's privilege-not-to-testify instruction if Potter was going to be giving "nonverbal testimony." (J.A. 233-34.) After the court and the People expressed their concerns, Potter's counsel stated, "I tell you what. There is a way to get around it. I'll just indicate that Mr. Potter has a blue shirt on. That's all." (J.A. 235.)

On July 29, 2011, the jury reached its verdict. It acquitted Potter of attempted first degree murder and unauthorized possession of a firearm during attempted first degree murder, Counts XIII and XIV, but found Potter guilty of all other charges. Potter filed a Motion for Acquittal on August 12, 2011, which the People opposed on August 26, 2011. The court denied that motion on September 2, 2011. On September 20, 2011, the court issued its Judgment and Commitment. It merged a number of the counts, and entered a judgment of guilty on the following charges: two counts of murder in the first degree, one count of assault in the third degree, and three counts of unauthorized possession of a firearm during

the commission of the predicate offenses.[9] (J.A. 31-36.) Potter filed a Notice of Appeal on August 5, 2011, and an Amended Notice of Appeal on September 6, 2011.[10]

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4 § 32(a). Because the Superior Court's September 20, 2011 Judgment and Commitment constitutes a final judgment, this Court possesses jurisdiction over Potter's appeal. *See, e.g., Browne v. People*, S. Ct. Crim. No. 2010-0069, 2012 V.I. Supreme LEXIS 9, at *6 (V.I. Feb. 2, 2012) (in a criminal case, written judgment embodying the adjudication of guilt and the sentence imposed based on that adjudication constitutes a final judgment for purposes of 4 V.I.C. § 32(a)); *Melendez v. People*, S. Ct. Crim. No. 2010-0071, 22012 V.I. Supreme LEXIS 8, at *6 (V.I. Feb. 2, 2012) (same).

We review the Superior Court's factual findings for clear error and exercise plenary review over the Superior Court's application of the law to those facts. *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007); *see also People v. John*, 52 V.I. 247, 255 (V.I. 2009) (quoting *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006)), *aff'd* 654 F.3d 412, 55 V.I. 1324 (3d Cir. 2011). Where an appellant fails to object to a Superior Court order or decision, we review for plain error. V.I.S.CT.R. 4(h); *Phipps v. People*, 54 V.I. 543, 546 (V.I. 2011).

---

[9] Potter was sentenced to life imprisonment without parole for each of the murder convictions; twenty years imprisonment for each of the unauthorized possession of a firearm convictions, with five years for each count suspended; and five years imprisonment for the third degree assault. The sentences for all other counts are to run consecutive to his sentence of life without parole for Count I, for first degree murder. Furthermore, he was ordered to pay $5,000 as a fine for each of the unauthorized possession of a firearm convictions, and to pay restitution to the victims' families. (J.A. 31-36.)

[10] Because Potter filed his Notice of Appeal before the Judgment and Commitment issued, this Court treats the Notice as having been filed on the date the Superior Court entered the final order, or, in this case, September 20, 2011. V.I.S.CT. R. 5(a)(1); *see also Fontaine v. People*, S. Ct. Crim No. 2010-0008, 2012 V.I. Supreme LEXIS 32, at *4 n.3 (V.I. Apr. 12, 2012) ("A notice of appeal filed after the announcement of an order or judgment, but before the entry of a writing memorializing the same, is 'treated as if filed on the date of and after such entry . . . and is considered timely filed' ").

## B. The Trial Court's Rulings on the Sitting of the Jury[11]

 Potter raises as his first issue on appeal the question of whether the trial court erred when it declined to strike the entire jury after they complained about their breakfast and rate of pay. It is incontrovertible that criminal defendants have a right — guaranteed to them by the Sixth Amendment[12] — to be tried by an impartial jury.[13] *Melendez*, 2012 V.I. Supreme LEXIS 8, at *39 (quoting *Skilling v. United States*, 130 S. Ct. 2896, 2912-13, 177 L. Ed. 2d 619 (2010)). However, Potter does not provide any reason for this Court to conclude that the jury in this case was biased or partial. There is simply nothing in the appellate record that would suggest that the jurors were inclined to punish Potter as a result of their apparent dissatisfaction with the conditions of their service. First, the court conducted a commendable voir dire and questioned each juror at length about whether they could remain impartial, and they all answered in the affirmative. (J.A. 66-145.) *See Melendez*, 2012 V.I. Supreme LEXIS 8, at *11 (noting that court should presume that the jurors cannot be impartial only in rare and extreme cases); *Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir. 1993) (noting that the appellate court will find abuse of discretion only if the voir dire examination is "so general that it does not adequately probe the possibility of prejudice"); *United States v. Resko*, 3 F.3d 684, 692 (3d Cir. 1993) (noting that a "determination of non-prejudice" should be upheld "out of deference to the [trial] court's superior ability to assess the situation and to evaluate the jurors' impartiality because it had questioned them individually"). At the risk of losing all alternates, the court even discharged three jurors who appeared to hesitate in their responses but who ultimately maintained that they

---

[11] Because Potter raised an objection to seating the jury below, (J.A. 48), this assignment of error is reviewed for abuse of discretion. *Dowdye v. People*, 55 V.I. 736, 751 (V.I. 2011); *see also United States v. Bertoli*, 40 F.3d 1384, 1392-93 (3d Cir. 1994) (noting that the trial judge's decisions regarding investigating jury misconduct, and its findings resulting from such an investigation, are reviewed for abuse of discretion).

[12] The Sixth Amendment of the U.S. Constitution applies to the U.S. Virgin Islands by virtue of Section 3 of the Revised Organic Act. *See Simmonds v. People*, 53 V.I. 549, 555 & n.3 (V.I. 2010). The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (2006), *reprinted* in V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995 & Supp. 1997) (preceding V.I. CODE ANN. tit. 1).

[13] The right to be tried by an impartial jury is limited to those circumstances in which the defendants have a right to a jury trial. *See Murrell v. People*, 54 V.I. 338, 350-60 (V.I. 2010) (discussing the right to a trial by jury in the Virgin Islands).

could fulfill their obligations. (J.A. 174, 195.) Second, if jurors were inclined to punish anyone as a result of their dissatisfaction — a contention for which there is no evidence — there is no reason to believe they would have penalized Potter rather than the People. As counsel for the People noted, it was the government — in the form of the judiciary — that required them to fly to St. Thomas to serve in sequestration, refused to pay them more than $40 per day, and provided what the jurors found to be an incomplete dining experience. (J.A. 49-50.) Consequently, Potter gives the Court no reason to believe that the trial court abused its discretion when it decided not to strike the entire panel. *Melendez*, 2012 V.I. Supreme LEXIS 8, at *43 n.20 (quoting *United States v. Moorhead*, 18 V.I. 431, 433 (D.V.I. 1981)) (noting that a defendant who raises a Sixth Amendment challenge to the partiality of the jury bears the burden of placing on the record sufficient evidence to show "a reasonable likelihood" that the jury cannot be fair). We conclude that the trial court did not abuse its discretion and we reject Potter's argument to the contrary.

## C. The Eyewitness Identifications

██ Potter also challenges what he considers to have been overly suggestive photo arrays, constituting a violation of his due process rights. *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968) (noting that a pretrial identification must be set aside if it is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"); *see also United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991) (same). When considering whether an identification was unduly suggestive, we consider first whether it was " 'unnecessarily' or 'impermissibly' suggestive," which requires this Court to assess the degree of suggestiveness presented by the identification procedure actually used in this case, and whether the police had good reason not to use less suggestive procedures. *Stevens*, 935 F.2d at 1389; *see also Richards v. People*, 53 V.I. 379, 387 (V.I. 2010) (discussing the two-part test). If the Court determines that the procedure was unduly suggestive, the Court considers the totality of the circumstances to determine whether it was so suggestive as to give rise to a substantial likelihood of misidentification. *Id.* To this end, we consider

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness'

prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *accord Richards*, 53 V.I. at 386.

 Here, although it is not abundantly clear, it appears that Potter argued that the police possessed insufficient evidence to place Potter in the photo arrays shown to the two witnesses in the first place. (S.A. 327, 330 ("What I'm saying to this Court, Your Honor, it is overly suggestive because there was not enough information based on the witnesses that were interviewed that would put Mr. Potter in the photo array.").) However, Potter cited no authority — and our research has produced none — to suggest that constitutional rights are violated when a defendant's image is placed in a photo array as a result of an investigation. Here, two witnesses described the suspect to the police — including descriptions of his race, complexion, hair style, approximate height and build — and one described the vehicle in which the suspect was driving. Based on this information, the officers suspected that Potter might have been involved. Such a suspicion on the part of the police does not violate Potter's rights. Had the police's suspicions been unfounded, the witnesses would not have selected Potter from the photo array. The mere presence of his picture within the array did not violate any cognizable right. *See United States v. Morgan*, 690 F. Supp. 2d 274, 290 (S.D.N.Y. 2010) ("The mere use of a photo array is not inherently suggestive . . . ."). Consequently, there was no error.

 Because Potter never indicated either below or on appeal any other alleged defects concerning the photo array which he found unduly suggestive — aside from the fact that his picture was in the array in the first place — and because Potter did not submit the questioned photo array to the Court for its own review, the Court's analysis is necessarily constrained. However, from the appellate record provided by the parties, there is nothing to indicate that the array was unduly suggestive. Both witnesses had the opportunity to see the face of the shooter at the scene or while fleeing therefrom and described the shooter as a black male, having "shoulder-length locks" or braids, with a slim build. (S.A. 229.) Here, the array contained six individual photographs, and all were of black men with shoulder-length locks, and they shared Potter's size, style

790

of facial hair and his complexion. (S.A. 255.) *See United States v. Foote*, 432 Fed. Appx. 151, 153-54 (3d Cir. 2011) (affirming a court's finding that an array was not suggestive when it had pictures of six men of the same race, approximately the same age, same build, and same hair style, even though the length and style of facial hair differed amongst the men). Furthermore, there is no evidence that the police intentionally or unintentionally suggested to the witnesses whose picture they ought to select from the array. (S.A. 244-45 (describing the procedures the police used).) *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003) (noting that an array violates due process if a particular picture is emphasized or the police or circumstances "unduly suggest" the picture the witness ought to select). From this record, Potter has failed to meet his burden of showing that the identification was the product of unduly suggestive procedures.[14] *See id.* at 115 (noting that the burden is on the defendant challenging the suggestiveness of the photo array). We therefore hold that the photo array identification procedure used in this case did not violate Potter's due process rights.

### D. Request For Jury View

 Potter requested the trial court to permit the jury to view the Corolla owned by Potter's sister, ostensibly to show that it was black — rather than dark blue — and that the eyewitness testimony provided by the People's witnesses should be discounted. However, Potter did not provide this Court with the relevant record — that is, his request and the trial court's rejection of that request. Consequently, the Court has an insufficient basis on which to evaluate the trial court's decision. Because Potter failed to adequately present this issue for appellate review as required under our Rules, we consider it waived. *See Bernhardt v. Bernhardt*, 51 V.I. 341, 345-46 (V.I. 2009); V.I.S.CT. R. 22(a)(3), 22(m).[15]

---

[14] Because we determine that the police's procedures were not unduly suggestive, we need not proceed to the second step of the analysis to determine if the suggestive procedures gave rise to a substantial likelihood of misidentification. *Stevens*, 935 F.2d at 1389; *accord Richards*, 53 V.I. at 387.

[15] Even if we were to reach the issue, it would offer Potter no relief. A trial court's decision whether to allow the jury to view objects outside the courtroom is highly discretionary. *United States v. Scroggins*, 648 F.3d 873, 874 (8th Cir. 2011). A trial court may properly exercise that discretion to deny such a view if it would be " 'time-consuming and cumulative.' " *Id.* (quoting *United States v. Johnson*, 767 F.2d 1259, 1273 (8th Cir. 1985)). Here,

## E. Closing Argument Jury Demonstration

Potter asserts that the trial court impermissibly shifted the burden of proof when it permitted counsel for the People to stand before the jury during summation, indicating the color of his clothing and that of the case agent, but denied Potter's attorney's request to have the case agent, People's counsel and Potter all stand for the same purpose — that is, to demonstrate whether a reasonable witness would mistake black for dark blue. (Appellant's Br. 12-13.) When Potter requested that People's counsel, Potter and the case agent stand before the jury, the People objected that they could not be used to support Potter's defense, implying that to do so would constitute a conflict of interest. (J.A. 234.) The trial court expressed a concern about giving the jury an instruction on the defendant's right not to testify if Potter was going to be engaging in "nonverbal testimony" by standing in a demonstration before the jury. (J.A. 233.) After raising these concerns, the court never definitively ruled against Potter; instead, Potter's counsel stated, "I tell you what. There is a way to get around it. I'll just indicate that Mr. Potter has a blue shirt on. That's all." (*Id.*) He then proceeded, without objection, during his closing argument to note that Potter was wearing a blue shirt. (*Id.*)

 It is not clear how the court's actions in this case purportedly shifted the "burden of proof." But in any case, we interpret the statement

---

Gumbs described the car as he recalled it. (S.A. 21 (describing the car as a "blue, dark blue" Toyota Corolla).) The People had admitted as evidence pictures of a similar car — a dark blue Toyota Corolla. (S.A. 21-23.) Gumbs testified that the car in the picture was the same type, model, tint and color as the car he saw on the day of the murders. (S.A. 21.) Consequently, the jurors could evaluate the color of the vehicle and use it to consider the credibility of Gumbs' testimony as to the vehicle's description. 23A C.J.S. *Criminal Law* § 1568 (noting that "[i]t is not an abuse of discretion for the court to deny a jury view where there are other means of acquainting the jury with the evidence, such as diagrams, and photographs"). Furthermore, had Potter wished to tender photographs of the actual car owned by Potter's sister, there is no indication that the court would have denied such a request. *See State v. Hill*, No. 10AP-177, 2010 Ohio 6121, ¶ 37 (Ohio App. Dec. 14, 2010) (noting that the defendant had an opportunity to present photographs in support of her defense, and also indicating that jury views are not evidence); *see also People v. Gonzalez*, 294 Ill. App. 3d 205, 689 N.E.2d 1187, 1193-94, 228 Ill. Dec. 766 (Ill. App. Ct. 1998) (affirming the trial court's refusal to allow a jury view because defendant had never tendered photographs or shown how photographs would have been an inadequate substitute for a view). Consequently, Potter was not denied the opportunity to present evidence in his defense, and, if Potter had not waived the argument, we would have found no error regarding the denial of his requested view.

by Potter's counsel that he had a solution as an acquiescence[16] and, as such, even if the trial court did err in its handling of the demonstrations before the jury, there would be no basis for reversal. *State v. Chaparro*, No. A-6255-03T4, 2006 N.J. Super. Unpub. LEXIS 54, at *15 (N.J. Super. Ct. April 10, 2006) ("Generally, trial error which is induced, encouraged, acquiesced in, or consented to by defense counsel does not form a basis for reversal on appeal."); *see also Latalladi v. People*, 51 V.I. 137, 143-44 (V.I. 2009) (discussing the "invited error" doctrine). Furthermore, even if Potter had not acquiesced to what might eventually have been the trial court's decision, and even if the decision was erroneous, it was not harmful. *Dowdye v. People*, 55 V.I. 736, 780 (V.I. 2011) (noting that an error is harmless if this Court can "conclude 'with fair assurance . . . that the judgment was not substantially swayed by the error' " (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946))). Potter's attorney was able to demonstrate the color of Potter's shirt while Potter was seated, and also referred to the color of the clothing of People's counsel and the case agent. The jury had ample opportunity to consider the contrasting colors. Consequently, even if there was error — which the Court need not decide[17] — any such error was harmless.

---

[16] In fact, Potter's attorney appeared to concede during oral argument that he had effectively abandoned the claim by attempting a different method to make the same point.

[17] We do note, however, that other courts have ruled that demonstrations during closing argument are not per se prohibited. Instead, a court performing such an inquiry typically considers whether the demonstration distorted the record evidence, or attempted to introduce new evidence. *Wilson v. State*, ___ So. 3d ___, 2012 Ala. Crim. App. LEXIS 27, at *69, 70 (Ala. Crim. App. March 23, 2012) ("There is no rule of law which limits counsel in debate to mere articulation. Argument by means of illustration . . . is a matter of every day practice, and the abuse of the utilization of such illustration is a matter for the trial court's discretion . . . Accordingly, it has been recognized than an attorney may employ demonstrations during his or her argument if they are reasonably sustained by the evidence, and in a number of cases a demonstration by counsel during closing argument has been held proper.' " (quoting *Jacob Stein, Closing Arguments*, § 1:68 (2011-2012 ed.))); *see also United States v. Klebig*, 600 F.3d 700, 719-20 (7th Cir. 2009) (finding error with a demonstration because it introduced new evidence); *see also Jackson v. Warden*, 271 Va. 434, 627 S.E.2d 776, 784 (Va. 2006) (indicating that a demonstration may be permissible if it does not distort the evidence). In this case, there was no evidence in the appellate record that the clothing worn by the participants at counsel's table bore any resemblance to any fact in evidence. However as noted above, if there was any error here, it was harmless, so we need not decide in this case what limits must guide the trial court's discretion in matters relating to closing argument demonstrations.

## F. Prosecutorial Misconduct

Potter also finds fault with the fact that Wilson Campbell, Esq., served as the Chief of the Criminal Division of the Attorney General's Office during the period in which the court conducted Potter's first trial in March 2011. Because Campbell was not licensed to practice law in the Virgin Islands at the time,[18] Potter argues, he could not have properly made the decision to retry Potter after the mistrial. Potter concludes, therefore, that his second trial constituted a Double Jeopardy violation.

 This argument is meritless. As a general rule, the declaration of a mistrial after the jury has become deadlocked does not ordinarily bar a retrial on Double Jeopardy grounds. *Yeager v. United States*, 557 U.S. 110, 118, 129 S. Ct. 2360, 174 L. Ed. 2d 78 (2009); *see also* 22 C.J.S. *Criminal Law* § 295 (2012). Moreover, it is not clear how Potter construes the prohibition against Double Jeopardy to include a requirement that the person making the decision whether to retry a case must be a licensed attorney.[19] In addition, Potter has not demonstrated that it was Campbell, rather than the Attorney General himself, who made the decision to retry the case.[20] *See Nanton v. People*, 52 V.I. 466, 491 (V.I. 2009) (Hodge, C.J., concurring in part and dissenting in part) (indicating that the appellant bears the burden of establishing the elements of plain error); *accord United States v. Vonn*, 535 U.S. 55, 58, 122 S. Ct. 1043, 152 L. Ed. 2d 90 (2002) (same).[21] Therefore, even if it would have been an error for Campbell to make the decision regarding whether to prosecute the case — a question we need not reach — there is no evidence that Campbell made

---

[18] Campbell applied for special admission to the Virgin Islands bar. On March 3, 2011, this Court remanded the application to the Committee of Bar Examiners so that it might more fully investigate Campbell's qualifications for admission. *See In re Application of Campbell*, S. Ct. BA. No. 2009-0230, 2011 V.I. Supreme LEXIS 28 (V.I. March 3, 2011).

[19] Indeed, there is no requirement that the Attorney General of the United States be a lawyer. 28 U.S.C. § 503. There is not even a requirement that the justices of the United States Supreme Court — who routinely remand cases for retrial — be lawyers. *See* 28 U.S.C. § 1; U.S. CONST. art. III.

[20] The People assert that the Attorney General replaced Campbell as Criminal Division Chief with Renee Gumbs-Carty, Esq., before Potter's retrial began. Aside from counsel's representation, there is no record evidence of this, and the Court cannot take judicial notice of it. *See Marcelle v. People*, 55 V.I. 536, 546 n.3 (V.I. 2011) (stating the requirements for a court to take judicial notice); *see also Henry v. Dennery*, 55 V.I. 986, 994 (V.I. 2011) (noting that unsworn representations by an attorney are not evidence).

[21] We review for plain error because there is no indication that Potter raised this claim below.

such a decision, or, if he did, that the decision would have been any different had it been made by an attorney who is licensed to practice in the Virgin Islands, such as the Attorney General or one of his designees. Consequently, Potter's retrial did not violate his right against Double Jeopardy and we reject Potter's claim of error on this ground.

## III. CONCLUSION

We hold that because the trial court did not err when it refused to strike the entire jury panel, or when it declined to permit the jury to view the Toyota Corolla; nor did it err when it declined to suppress the out-of-court identifications made from the photo array. Potter acquiesced to having the jury view his clothing during closing argument while he was seated rather than standing, and his retrial after the first trial resulted in a deadlock did not violate the prohibition against Double Jeopardy. For these reasons, the September 20, 2011 Judgment and Commitment is affirmed.